PAUL WESTPHAL, a Corporation, Respondent, *v.* WESTPHAL'S WORLD'S BEST CORPORATION and Others, Appellants.

First Department, March 19, 1926.

**Trade-marks and trade names — action to restrain use of family name of " Westphal " in connection with hair tonics and barbers' supplies — plaintiff is owner of original " Westphal " hair tonic which is used generally in barber shops throughout country and is well known — grandson of original producer organized defendant and is selling hair tonics similar in ingredients and color to plaintiff's tonic and is using similar labels and containers — defendants' advertising and conduct shows dishonest effort to destroy plaintiff's business — injunction restraining defendants from manufacturing, selling or dealing in hair tonics or barbers' supplies anywhere under name " Westphal " used alone or in connection with other words is not too broad.**

An injunction was properly granted in an action to restrain the defendants from using the name " Westphal " in connection with the manufacture and sale of hair tonics and barber supplies, since it appears that the plaintiff is the owner of the original " Westphal " formula and trade-mark and trade name for the production, manufacture and sale of hair tonic; that said hair tonic is used in nearly every barber shop in the country and is well known by customers of barber shops under the name of " Westphal's," although the original name was " Westphal's Auxiliator; " that the grandson of the original producer of the hair tonic organized the defendant corporation, which corporation is selling hair tonic that is similar in ingredients and color to the original hair tonic

produced by the plaintiff and is put up in containers of similar design and size with labels that are similar to those used by the plaintiff which are protected by registry in the United States Patent Office; and that the advertising by the defendant and the conduct of the defendant and its officers both before and after its organization, clearly indicate a dishonest purpose by the use of the name " Westphal's " to injure and destroy the business conducted by the plaintiff.

The use of a family name in trade may be restrained where it appears that it is being used dishonestly and for the avowed purpose of injuring another.

Under the circumstances, and the facts presented in this case, the injunction was not too broad which restrained the defendants from manufacturing, selling or dealing in hair tonics or barbers' supplies within the State of New York or elsewhere under the name of Westphal, Paul Westphal, Westphal's, Paul Westphal Co., Westphal's World's Best Corporation, or any of said names, or using said name of Westphal either alone or in conjunction with other words or symbols in connection with the hair tonic or barbers' supply business.

CLARKE, P. J., and FINCH, J., dissent in part, with memorandum.

APPEAL by the defendants, Westphal's World's Best Corporation and others, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 11th day of July, 1925, upon the decision of the court rendered after a trial at the New York Special Term.

The judgment enjoins and restrains the defendants from manufacturing, selling or dealing in hair tonics or barbers' supplies within the State of New York or elsewhere under the name of Westphal, Paul Westphal, Westphal's, Paul Westphal Co., Westphal's World's Best Corporation, or any of said names, or using said name of Westphal either alone or in conjunction with other words or symbols in connection with the hair tonic or barbers' supply business.

*Palmer & Serles* [*Martin Conboy* of counsel; *William Huck, Jr.*, with him on the brief], for the appellants.

*Hamilton & Freeman* [*William H. Hamilton* of counsel; *Norman C. Conklin* with him on the brief], for the respondent.

MERRELL, J. The facts upon which this controversy depends are somewhat unusual. Both the plaintiff and the defendants are manufacturing and selling to the trade hair tonics of practically the same color and which for a time were put up in containers similar in form; and the tonics put out by both parties were quite similar in appearance, differing slightly in the perfume used in connection with their manufacture. These hair tonics had their inception many years ago with the coming to this country of a German by the name of Paul Westphal. The elder Paul Westphal was a barber and ran a small shop on the West Side. He appears to have been progressive and ambitious and to have been somewhat of a genius in the preparation of such lotions and tonics as were

used by those engaged in his trade.  In 1881 he invented and put upon the market, at first in a modest way and to a limited extent, a hair tonic which he called " Westphal's Auxiliator."  This tonic had an alcohol base of fifty-five per cent.  The tonic was put up in bottles of two sizes, five and one-half ounces and twelve ounces.  The inventor obtained and registered at Washington a trade-mark represented by a small paster about an inch square of black with white lettering and in the center a red disk bearing the initials, " P. W."  In 1882 he adopted and registered in the United States Patent Office at Washington, D. C., a label placed upon the bottles, at the top of which appeared the word " Westphal's " and beneath in different type the word, " Auxiliator; " then, below, the statement that it contained fifty-five per cent of grain alcohol and was for the preservation, beauty, growth and restoration of the hair.  Directions for using were printed on the label, and it was finally signed, " Paul Westphal, New York."  There was also noted thereon that the label was registered in the United States Patent Office at Washington in the year 1882, and that the trade-mark was registered August 11, 1903.  From 1881 until the present time the manufacture and sale of this tonic has continued, the same form of bottle being used with the same label as originally appeared upon the hair tonic put out by Paul Westphal.  Paul Westphal died in 1907, leaving a widow and seven children, namely, his sons, Louis, Oscar, Edgar, Paul, Henry and Fred, and a daughter, Nellie.  The widow and the seven children still survive. Paul Westphal made a will wherein he named his widow and his two sons Louis and Oscar as executors.  They qualified as such and carried on the business founded by their father until the year 1910 when a corporation was formed under the name of Paul Westphal.  The capital stock of the new corporation was held by the executors for the benefit of the estate.  Louis Westphal was elected president and treasurer, Oscar Westphal, vice-president, and the widow, secretary of the corporation.  That organization has continued until the present time.  The hair tonic business from its beginning grew quite rapidly.  The tonic itself is acknowledged by all to be a most excellent preparation, and is in general use in barber shops throughout the country.  It is on sale at drug stores and in department stores.  It is generally known under the trade name of " Westphal's."  Indeed, the name " Auxiliator," somewhat difficult of pronunciation, is seldom used in the trade. A large amount of evidence was given at the trial to the effect that barbers are generally asked by their patrons for " Westphal's," and are accustomed to ask their customers if they shall use " Westphal's " upon their hair.  Thus the name of Westphal's has

acquired a secondary meaning and in reality describes the hair tonic manufactured by the plaintiff and which was originally invented by the elder Paul Westphal. There is probably hardly a barber shop in the United States in a town of any importance which does not have Westphal's upon its shelves. It is no longer known as "Westphal's Auxiliator," but is generally known as "Westphal's."

The defendant Paul Westphal is a grandson of the original Paul Westphal. After the death of his grandfather and when he became a youth of seventeen years of age or thereabouts, the grandson was given employment by his uncles and grandmother, who were carrying on the business originated by his grandfather in the manufacture and sale of the hair tonic known as Westphal's. He evidently was not satisfied with his opportunities and worked for the plaintiff for only about eleven months. He was given the menial work of cutting up soap for an egg shampoo which the plaintiff was also manufacturing. He also was called upon to attend to the furnace used to heat the little factory where the hair tonic was made. He stated in his evidence that he was given the "dirty work" to do. He received twelve or fourteen dollars a week at first and was finally paid twenty dollars a week for his services. He was not satisfied with this and he left the plaintiff's employ. He first engaged as a ticket agent at a station on Long Island, and afterwards went into the barbers' supply business, dealing generally in hair brushes, shaving tools, razors, lotions, hair tonics, soap, etc., used by barbers. He did not continue at this for long and finally undertook the manufacture and sale of a hair tonic himself. Sometimes he was in partnership with another and at times he ran the business alone. For some time while in partnership he used the name "Paul Westphal Company," and his hair tonic, resembling in color and appearance, and in similar containers to those used by the plaintiff, was sent out under the name of "Paul Westphal Company." It was called "Westphal's World's Best Hair Tonic." On the neck of the bottle used by the plaintiff for distribution of its "Westphal's" there is an oval label upon which appears the words "Guarantee Paul Westphal." On the neck of the bottle put out by the defendants under the name of Paul Westphal Company, of their hair tonic, there was an oval label similar in shape to that used on the plaintiff's bottle, and upon which the words appear "Guaranteed Paul Westphal Co., New York." The defendant Paul Westphal, in or about November, 1924, in conjunction with the defendant Honic, incorporated his business under the name of "Westphal's World's Best Corporation," and upon their containers as used at the time

of the trial there appeared upon the label at the foot thereof " Manufactured by Westphal's World's Best Corp., Paul Westphal, Pres., New York." It is the use of the word " Westphal " in connection with the sale and distribution of hair tonic to which the plaintiff objects and which the court, by the judgment appealed from, restrained the defendants from using.

At first thought it would seem somewhat unusual, at least, that a man should be restrained from using his surname in connection with his business and in advertising wares which he manufactured. Unquestionably, if the evidence indicated that the defendants had acted honestly in adopting the word " Westphal's " to describe their goods, and thereby they had not deprived the plaintiff of a property right in such name and had done nothing to injure the plaintiff, the court would have been compelled to deny the plaintiff injunctive relief. After reading the evidence in the case, we are convinced that the defendants have not acted honestly, but have illegally appropriated the name " Westphal's " and have sought by advertising and by putting out their goods, to destroy the plaintiff and through fraud and deceit to deprive it of a property right which the plaintiff, through long years of hair tonic manufacture and in advertising the same and in dealing with the trade, had acquired. Not only this, but the evidence shows and is uncontradicted that the president of the defendant, young Paul Westphal, has threatened to destroy the plaintiff and to drive it into bankruptcy by appropriating the name " Westphal's." The evidence leaves no doubt in our minds that the defendants have been guilty of a most palpable fraud upon the plaintiff.

The defendant Honic, for several years was employed by the plaintiff as a salesman. While in such employ he secretly and without the knowledge of the plaintiff or its officers, while distributing plaintiff's product upon a ten per cent commission basis, was distributing and selling a competing hair tonic of his own manufacture. When the term of his original contract ended, Oscar Westphal, the plaintiff's vice-president and its real head, refused to give Honic a new contract. The plaintiff corporation has had many troublous experiences in connection with carrying on its business — internal as well as external. Repeated attempts have been made by others to appropriate its trade name and good will, and plaintiff has been compelled to resort to the courts and obtain injunctive relief restraining others from infringing upon its rights. Not only this, but about 1910 there was a man by the name of Smaw connected with the plaintiff corporation. Smaw was a lawyer well advanced in years and did some little legal work in connection with the plaintiff's business, and looked after tax

matters for those connected with the plaintiff. He was given desk room in plaintiff's office and was kept upon plaintiff's payroll. Smaw, the evidence would indicate, turned out to be a disturbing element, and entered into a conspiracy with Louis Westphal, the nominal president of the plaintiff, but who himself owned only one-seventh of a two-thirds interest in the business, and made claim that the estate of Paul Westphal, deceased, and the business then being carried on by the executors were indebted to him in a considerable sum. Action was brought against the executors up in Rockland county. Process was served upon Louis Westphal without the knowledge of his brother Oscar or the others actively interested in the business. Judgment was obtained and it was claimed a sale was made of all of the stock, fixtures and business rights of the Westphal Company then being carried on by the executors of Paul Westphal, deceased. The first intimation that Oscar Westphal had of all of this was when Smaw cooly announced one day that he had reorganized the business and had incorporated the same and was the owner of the entire works. Oscar Westphal at once took legal counsel, and action was started, the result of which was that the attempt of Smaw to gobble the business was set aside, Smaw himself landed in jail, where he was sojourning at the time of the trial with a judgment of some $10,000 against him for moneys of the concern illegally converted by him. The evidence is undisputed that in this fiasco of Smaw's he had the support and approval of Louis Westphal, and that the defendant Honic was also in the conspiracy. From that time on Louis Westphal appears to have taken no active interest in the affairs of the plaintiff corporation. Soon thereafter the business was incorporated under the name of Paul Westphal.

For many years the plaintiff and its predecessor have been engaged in systematic advertising of hair tonic, known as " Westphal's Auxiliator." This advertising was carried on by means of rather ornate and expensive placards displayed in prominent places, in transparent window advertising, in the distribution of circulars among the barber supply houses, and by advertising in trade publications throughout the country. The evidence is to the effect that in the year preceding the trial the plaintiff spent some $12,000 in such advertising, and that in previous years since the corporation was formed and before, the average expenditure for advertising was $7,000 a year. These sums are not relatively great amounts to be spent for advertising, but it appears therefrom that the plaintiff has consistently and constantly advertised its hair tonic, thereby building up a prosperous business. The evidence shows, moreover, that " Westphal's " is used throughout the

country and is generally regarded as the best hair tonic upon the market; that its use is beneficial to the scalp in the elimination of dandruff and in the preservation and growth of the human hair. It is evident from the testimony that young Paul Westphal and his father and mother were dissatisfied with the somewhat conservative methods of advertising and putting out the hair tonic which the plaintiff adopted and has consistently followed. The plaintiff never sold its goods in bulk, always advertising that it was sold only in twelve-ounce and five and one-half-ounce bottles. On the other hand, soon after the defendants started in the business of selling hair tonic, their product was widely advertised in the trade journals and throughout the country, and in these advertisements it was stated that the hair tonic put out by the Paul Westphal Company was " now sold in bulk." The evident purpose of such advertising and the use of the words " now sold in bulk " was to give the trade the impression that the defendant company was dealing in the original Westphal's tonic, and that a new policy had been adopted by the old original company of selling its commodity in bulk at a comparatively low price. That such advertising did have that effect with the trade appeared from the large number of letters offered and received in evidence from barber supply houses throughout the country to the plaintiff asking information as to whether the preparation " Westphal's World's Best Hair Tonic," as advertised by the defendants, was manufactured by the plaintiff company and whether it was true they sent out their goods in bulk. Large numbers of orders came to the plaintiff from various jobbers and barbers' supply houses throughout the country asking the plaintiff to forward large quantities of their hair tonic in gallon containers — the bulk packages put out by defendants. A great deal of confusion has resulted, and a large number of letters were introduced in evidence showing that the trade was misled by defendants' advertising.

The evidence shows that the defendants have been most unfair in their practices, and that if possible the plaintiff should receive injunctive relief against a continuance of defendants' practices. That the trial justice was so impressed appears clearly from the verbal opinion rendered by the learned justice near the close of the testimony in the case. In this connection the court said:

" I will announce right now that I shall give judgment for the plaintiff and an injunction enjoining the defendant corporation from using any preparation that is similar to the plaintiff's, any preparation that has the shade of color of the plaintiff's, any container that is similar to the plaintiff's container, or any container that is as similar to it as those which are exhibits here.

" Further, the defendant will be enjoined against the general use of advertisements in the conduct of its business such as would deceive not chemists, not lawyers, but such as would deceive barbers and customers who would only incidentally look at a preparation submitted to them.

" By reason of the fact that it appears that this young man Paul Westphal, who bears the same name as his grandfather, is engaged in this business, and as counsel for the defendant contends that there is no power in the court to stop him in the use of his name, I would say that as I understand the authorities the rulings of the courts are that this cannot be done so long as he honestly uses his own name. The testimony here shows that right from the beginning, even while Louis Westphal was active in the plaintiff's business, and Honic was a salaried employee of the plaintiff, they were then working against the interests of the plaintiff corporation, because Honic who was their sole salesman was selling the product of another company in which he and Louis Westphal were interested, and when that company was given up then this last new company, which is the defendant in this action, was organized.

" Nothing impresses me more as to the dishonesty of these people who are conducting this defendant company than the advertisements which defendant's counsel has introduced in evidence, and it satisfies me that as far as the court has power to do it the whole transaction should be enjoined. As to what words shall be used in the formal injunction order and judgment to be entered on this decision I am somewhat uncertain about. It might be well for counsel to consult on that point. In any event I direct that the decision and judgment be submitted on notice, and include just as much as the court is authorized to give toward stopping these men who dishonestly and with malice aforethought entered into business with the idea of destroying the plaintiff's business because they did not think they were advanced enough in their methods of business, and instead of honestly getting possession of the corporation they have adopted the name, using the name Paul Westphal, in order to destroy the plaintiff corporation. There is no doubt the court should issue an injunction in this case.  \*  \*  \*

" The question I have got to decide now is what words that injunction shall contain. Any honest business man could tell without being a lawyer at all that this young grandson thought he saw a mint of money in getting control of that business; he probably felt, being advised by Mr. Honic, an active salesman, that if they could only take possession of that business they could

make ten times more than they did. This old grandmother, who represents the original Paul Westphal, has got the best right to come into this court to protect her interest as a stockholder in this plaintiff corporation and the court will go as far as it possibly can under the law to do that, in order in addition, to give this young man a lesson that although every young man if he will go into business honestly has a chance to succeed, the courts are here to prevent the very thing that he started to do here in the opening of his business career. And when I saw his father, the president of the plaintiff corporation, sitting beside his son whom he wanted to help destroy the old corporation — why, the court would not allow it. There is no judge that ever listened to an injunction suit and listened to the evasive and uncertain testimony given by this young man and by Honic in reference to important material things in this case that would not right from the bench say Injunction issued. If there is any way of this family getting together let them get together. If there is not, then the injunction has got to issue."

From the colloquy of counsel, when the trial court thus announced its intention, it appears that even the trial counsel for the defendants admitted that plaintiff was entitled to some relief by way of injunction.

The only question that remains is as to whether or not the trial court exceeded its power in granting the injunction contained in the judgment appealed from. We are of the opinion that the injunction granted was none too broad, and that nothing short of the relief granted will afford the plaintiff any protection from the fraudulent practices to which the defendants have resorted in the past, and to which, unrestrained, they would probably resort in the future. The evidence, as we view it, is replete in showing the unfair and dishonest methods adopted by Paul Westphal and his associate, Honic, and of the corporation which they organized in carrying on its business. Prior to the organization of the defendant corporation, known as Westphal's World's Best Corporation, the defendant Westphal had adopted the name of " Paul Westphal Company." On September 15, 1924, the Paul Westphal Company sent out a circular letter known as " Convention Special," in which they advertised " Westphal's World's Best Hair Tonic." Much advertising was done at and about that time by the Paul Westphal Company of New York, the trade name adopted by the defendants. Window display cards were put out by the defendants bearing the inscription, " Westphal's " in large letters and beneath " World's Best Hair Tonic, manufactured by the Paul Westphal Company, New York." The defendants advertised

in the Barbers' Journal as late as February, 1925, " Westphal's World's Best Hair Tonic is *the original and genuine formula* and best foaming tonic manufactured." (Italics are the writer's.) At about this time they commenced to use the words in their advertising matter " Now sold in bulk." The evidence was to the effect that the defendants' hair tonic was manufactured by young Paul Westphal, and yet the evidence shows that he had no experience as a chemist and knew nothing of compounding the ingredients of the tonic. He denied any knowledge of the formula of which plaintiff's tonic was made. Nevertheless, the tonic which he put out was shown to be made up of practically the same ingredients and to be of almost precisely the same color as that of the original Westphal's. That the name " Westphal's " is the important name in connection with these tonics appears from its general use in advertising. The evidence also shows that large numbers of orders for plaintiff's hair tonic were received by the Paul Westphal Company, and that many of these orders were not forwarded to the plaintiff, but in some cases, at least, were sent back to the persons ordering the goods with a statement that the defendant company did not make the Auxiliator, and soliciting from the persons ordering, orders for defendants' product. The evidence also shows that the defendant Honic himself incorporated a hair tonic company known as the " Bald Pate Company," and that Louis Westphal, the nominal president of the plaintiff, and the father of the defendant Paul Westphal, without the knowledge of Oscar Westphal or those connected with the plaintiff, joined with Honic in his corporation, taking one-half of its capital stock. Finally, this corporation was sold out to three individuals. In the Bald Pate Company, Honic was president, Louis Westphal was secretary and treasurer, and his wife, defendant's mother, Hattie W. Westphal, was vice-president. The evidence clearly indicates a very bald attempt on the part of the defendant Paul Westphal, aided and abetted by his father and his mother, to wreck the original concern and to appropriate its business. A bit of evidence given near the close of the trial sheds considerable light upon the animus of the defendant Paul Westphal. Oscar Westphal, the vice-president and acting president of the plaintiff, testified, with reference to talks that he had had with the defendant Paul Westphal, in which he had remonstrated with his nephew against the use of the name Westphal to the injury of the plaintiff. The following testimony occurred: " Q. What have you ever said to him [Paul Westphal] about using the name Westphal in the hair tonic business? A. I told him he should give it up or otherwise I would start suit against him. Q. And what did he say? A. He said he would make me

bankrupt selling this stuff.   Q. Did you tell him what you have stated more than once?   A. Yes, sir; lots of times I told him that. Q. And he responded that he would make you bankrupt by using the name Westphal, did he?   A. Yes, sir."   This most important testimony as showing the attitude and the dishonest intention of the defendant Paul Westphal stands undenied in the record.   Paul Westphal was present at the trial several days and was long upon the witness stand, and the important testimony given by his uncle above quoted remained uncontradicted.   The whole testimony shows to this court, as it did to the learned justice presiding at the trial, that the defendants were attempting to wreck the plaintiff and to appropriate its business and good will.

The law is well settled that even in cases where family names are involved a person may not give his name to a corporation and thereby take from another concern its good will and rights which it has acquired by the use of such name.   The case of *Higgins Co.* v. *Higgins Soap Co.* (144 N. Y. 462) is in point.   In that case the plaintiff Higgins Co. and its predecessors had been engaged for years in the manufacture of soap.   The name Higgins had acquired a secondary meaning indicating not only the soap but its maker.   Charles S. Higgins was originally connected with the plaintiff under a contract which reserved to him the right to engage in the soap business at such time as plaintiff should terminate his employment at $15,000 a year.   His services were terminated and thereupon the said Charles S. Higgins organized the defendant corporation under the laws of the State of New Jersey, and started a rival business in the city of Brooklyn.   The name of the plaintiff was Charles S. Higgins Company.   The defendant's name was the Higgins Soap Company.   The plaintiff's soap was known as Higgins soap.   On the defendant's wrappers appeared the words, " Higgins Soap Company, Original Laundry Soap, Charles S. Higgins, Prest." And to digress a moment, it should be mentioned that the defendant repeatedly advertised its hair tonic as " Westphal's World's Best Hair Tonic is the original and genuine formula."   Young Paul Westphal explains this by stating that he meant that it was his original formula.   His explanation is hardly satisfactory.   In the *Higgins* case the Court of Appeals, reversing the lower courts, held that the plaintiff was entitled to an absolute injunction restraining the defendant from using its corporate name.   The case appears to be on all fours with the case at bar.   In the course of the opinion the court said (at p. 468):

" The sole test of liability is whether the acts done, either in organizing the defendant or in the prosecution of its business subsequently, invaded any right of the prior corporation or exceeded

the boundaries of fair competition. On the other hand we think it is equally clear that the defendant derives no additional immunity from the fact that the name of ' Higgins ' in its corporate name, was that of one or more of its corporators, or that Charles S. Higgins, or any one of that name, might engage in the soap business under the family name, or that Charles S. Higgins and the other corporators of the same name had consented to its use."

The Court of Appeals in the *Higgins* case wrote a very exhaustive opinion from which it will be drawn that while a person may use his own name in his own business, he may not in bad faith give it to another and thereby deprive one who has obtained the right to use such name and whose goods are identified by the name, from a property right therein. The Court of Appeals further said in the course of the opinion (at p. 471):

" The inference seems irresistible that the defendant assumed its corporate name so that it should carry the impression that it was the manufacturer of ' Higgins Soap,' so well known to the public."

There is not the slightest doubt from the evidence but what Paul Westphal adopted and exhibited the name " Westphal's " with a view of creating the impression that his preparation was the original preparation of his grandfather. The defendant's preparation is sold in bulk, and the evidence showed that it was put out at a much less price than the plaintiff's bottled goods. The evidence also indicated that the bulk packages of hair tonic sent out by the defendant were sold and distributed by unscrupulous agents under the claim that it was the original Westphal's, and that empty bottles which had contained the original Westphal's were refilled from the gallon cans of defendant's hair tonic. To like effect is the case of *Ajax Tool Co.* v. *Buchalter Tool Co., Inc.* (125 Misc. 752).

Mr. Justice LAUGHLIN, sitting at Special Term in Chautauqua county, in *Howes Co.* v. *Howes Grain Cleaner Co.* (24 Misc. 83) held under circumstances almost identical with those in the case at bar that the defendant should be restrained from the use of the word " Howes " in connection with its business. There appears to have been no appeal from the decision of Mr. Justice LAUGHLIN in the *Howes* case, and we think that his opinion correctly states the law. In the opinion, Mr. Justice LAUGHLIN, among other things, said (at p. 85):

" These facts were known to a majority of the incorporators of the defendant. The plaintiff's corporate name gives no indication of the nature of the business it was organized to carry on. The defendant's corporate name indicates its business quite accu-

rately, but it as accurately indicates the business done by the plaintiff and its predecessors.

" The incorporators of the defendant deliberated on the selection of a name for the new company. Their attention was at that time drawn by one of their number to the question as to their right as against the plaintiff to use the name finally adopted. Some of the other incorporators of the defendant possessed as great a knowledge and experience in the business and had as extensive a reputation and acquaintance as Charles N. Howes, whose surname they used in their corporate title, after purchasing the right so to do from him.

" The facts established give rise to the inference that these incorporators knew and realized that the name Howes was valuable in that line of business on account of the reputation given to it by said Simeon Howes, and not on account of the reputation of Charles N. Howes, and that in thus using that name, they expected to profit by the reputation of the former.   *   *   *

" The evidence shows some confusion of business directly attributable to the similarity of these corporate names. Business letters of inquiry as to prices of machinery, preliminary to placing orders, have been addressed to and received by the defendant when they were intended for the plaintiff. In some such instances the defendant, in addition to replying that it did not manufacture the particular machinery concerning which inquiries were made, took occasion to recommend its own machinery.

" The use of the name Howes, in the defendant's corporate name, under these circumstances, has resulted in unfair competition, and amounts, at least, to a constructive fraud upon the rights of the plaintiff, and upon principle and authority authorizes and requires the granting of a permanent injunction." (Citing numerous cases.)

A temporary injunction had been granted previously and sustained on appeal, restraining defendant from using its name. (*Howes Co.* v. *Howes Grain Cleaner Co.*, 19 App. Div. 625.)

The case of *DeLong* v. *DeLong Hook & Eye Co.* (10 Misc. 577; affd. as mod., 89 Hun, 399) is a leading case upon the subject. In that case the court held that " the right of a person to use his own name in his business does not authorize him to give his name to a corporation with a view to make it similar to that employed by other persons in the same business, to their injury or that of the public." The trial court, Mr. Justice O'BRIEN writing, among other things, said (at p. 582), concerning the right of a person to use his own name in his own business, that " The right, however, of one to use his own name in his own business is something very

different and distinct from the lending or giving of his name to a corporation for the purpose of engaging in a business which has been conducted by others under precisely the same name." In the course of his opinion Mr. Justice O'BRIEN refers to certain cases where injunctive relief · was denied and as to them the learned justice said (at p. 583): " It was found, however, in these cases as a fact that there was no attempt to deceive and no tendency to deceive the public by the use of the names employed."

In the case at bar the record is replete with evidence showing not only an attempt to deceive, but that a great confusion resulted in the trade generally from the use of the name Westphal's in connection with the defendant's business and advertising. The General Term, First Department, affirmed Mr. Justice O'BRIEN in the *DeLong Case* (89 Hun, 399). In the course of the opinion of the General Term, written by Mr. Justice PARKER, the learned justice said (at p. 402):

" The real test in such cases is whether the thing offered for sale is so arranged and exhibited that when it strikes the eye of an intending purchaser, possessed with ordinary intelligence and judgment, a false impression is likely to be produced that the goods of another are being offered for sale. And when that inquiry must be answered in the affirmative, as it has been in this case, ' it is the province of equity to interfere for the protection of the purchasing public as well as of the plaintiffs, and for the suppression of unfair and dishonest competition.'    *    *    *

" It is the appellant's contention that, notwithstanding the determination of the court that defendant's conduct in the use of the word ' DeLong,' was intended to deceive the public and enable it to sell its goods as if they were plaintiffs' goods, and, therefore, fraudulent, still it cannot be visited with the consequences which ordinarily flow from such action, because of the fact that one of its incorporators and stockholders bore the name of DeLong.    *    *    *

" But that is not this case, for the promoters of this corporation could have given to it the name of either of the other incorporators, or any other name they liked, provided the designation was honestly made and without injury to others. But the circumstances surrounding the creation of the defendant, and the name of it, satisfy us, as they did the trial court, that the selection of the name was not an honest one, but a part of the original scheme of Oscar A. DeLong to make such use of his own name as would enable him to profit by the name which the plaintiffs had given to their hooks and eyes, and which they had made valuable by much labor and a liberal expenditure of money.

" The recent case of *Higgins Company* v. *Higgins Soap Company* (144 N. Y. 462), decided since the entry of the judgment appealed from, is conclusive upon the proposition that a corporation will not be permitted to make use of a name thus acquired and for such purposes.    *   *   *

" In this case Oscar A. DeLong, the original promoter of defendant, knew all the facts.    *   *   *   And further than that, the facts before us are such, as we have already said, as to require the inference that he brought about the naming of the defendant with the intent that the public should receive the impression that it was the manufacturer of ' DeLong's Hooks and Eyes,' so well and favorably known to the public.

" The court further decided in *Higgins'* case that the defendant derived no additional immunity from the fact that the name of ' Higgins,' in its corporate name, was that of one or more of its incorporators, or that one of its members might have engaged in the same business under his own name, or had consented to the use of the name by the defendant.   The decision in *Higgins'* case answers the contention of the appellant as to that point.   The same proposition was recently asserted in *William Rogers Mfg. Co.* v. *R. W. Rogers Company* (66 Fed. Rep. 56).

" In view of the comment which the court made in *Higgins'* Case (*supra*) upon *Meneely* v. *Meneely* (62 N. Y. 427), it is sufficient to say in this case that it is not in point.

" While fully concurring with the main features of the judgment, we, nevertheless, think the complaint of the appellant, that the judgment is too broad, is well founded.   It is certainly more comprehensive than either the decision or the opinion of the trial court.   We find no authority in this record for holding that the defendant may not manufacture and sell hooks and eyes of the character which it was manufacturing.   Nor are we able to find any basis for the claim that the plaintiffs have the exclusive right to the use of cards to hold hooks.   In so far as the judgment restrains the defendant from using the word ' DeLong ' the judgment should be affirmed, but it should not embarrass the defendant in any honest effort which it may hereafter make to put its goods upon the market in a manner which shall not have the effect of persuading customers that the defendant's goods are the manufacture of the plaintiffs."

This court is unanimously of the opinion that the plaintiff is entitled to injunctive relief, but a minority of the court feel that the injunction granted by the court below is too broad, and cite, in support of their contention, the case of *Merritt Burial & Cremation Co.* v. *Merritt Co.* (155 App. Div. 565; mod. in Court of Appeals

First Department, March, 1926.                [Vol. 216

on dissenting opinion of Ingraham, P. J., in this court, 214 N. Y. 676). In the *Merritt* case a very broad injunction was granted the plaintiff by the Special Term, restraining defendant corporation from transacting or seeking to transact any undertaking, funeral or embalming business within the city of New York under the name or style of "The Stephen Merritt Company," or under the name, style, title or designation of which the name "Stephen Merritt" forms a part, or from displaying at any such place of business, any portrait, bust or likeness of the defendant Rev. Stephen Merritt or from advertising to the public that the defendant Rev. Stephen Merritt is employed by said corporation. The individual defendants were enjoined from transacting, or seeking to transact, within the city of New York any undertaking, funeral or embalming business under the name or title "Stephen Merritt Company," or under any name, style, title or device of which the name "Stephen Merritt" forms a part, and the defendant Rev. Stephen Merritt was enjoined from transacting or seeking to transact within the city of New York any undertaking, funeral or embalming business under his own name or any name, style, title or device of which the name "Stephen Merritt" forms a part, or granting any license to any individual, partnership or corporation transacting or seeking to transact any such undertaking, funeral or embalming business within the city of New York, to use the picture, portrait, name, fame or reputation of the defendant Rev. Stephen Merritt, directly or indirectly, for the purpose of soliciting trade, custom or patronage. He was also enjoined from soliciting business, either for himself or for any individual, partnership or corporation engaged in the undertaking, funeral or embalming business within the city of New York. The defendant Stephen Merritt, Jr., was enjoined from transacting or seeking to transact within the city of New York any undertaking, funeral or embalming business under the name or title "Stephen Merritt Company," or any name, style, title or device of which the name "Stephen Merritt" forms a part or from acting as officer or incorporator of any corporation bearing such name, style or title, engaged in carrying on either of the aforesaid business or businesses, except that he might carry on the said business or businesses under the title "Stephen Merritt, Jr.," or "Stephen Merritt, The Younger." In that case a majority of this court upheld the injunction granted by the trial court. The Court of Appeals, however, modified the judgment of affirmance of this court on the dissenting opinion of Ingraham, Presiding Justice of this court. An examination of the prevailing and dissenting opinions in this court in the *Merritt* case clearly distinguishes that case from the case at bar.

In that case there was no charge of fraud in the use of the name " Stephen Merritt " in connection with the defendant corporation. Presiding Justice INGRAHAM, in support of the proposition that one may not be deprived of the use of his own name in business, cited the well-known authorities of *Meneely* v. *Meneely* (62 N. Y. 427), *World's D. M. Assn.* v. *Pierce* (203 id. 419) and *Donnell* v. *Herring-Hall-Marvin Safe Company* (208 U. S. 267). In discussing these cases, Presiding Justice INGRAHAM, in his opinion, said (at p. 573): " In *Meneely* v. *Meneely* (62 N. Y. 427) the defendants had been enjoined from the use of their own name in the bell foundry business; the referee found that the use of the name ' Meneely ' was calculated to, and did, mislead persons who were not personally acquainted with the plaintiffs and defendants, and that the use of the name Meneely was injurious to the plaintiffs' business.  In sustaining a reversal of that judgment, RAPALLO, J., said: ' The manner of using the name is all that would be enjoined, not the simple use of it; for every man has the absolute right to use his own name in his own business, even though he may thereby interfere with or injure the business of another person bearing the same name, *provided he does not resort to any artifice or contrivance for the purpose of producing the impression that the establishments are identical, or do anything calculated to mislead.*' "  (Italics are the writer's.)

It is apparent, therefore, that the *Meneely* case, upon which Presiding Justice INGRAHAM relied, is clearly distinguishable from the case at bar, and is an authority in support of the granting of the injunction in the judgment appealed from.  In the case at bar the evidence is overwhelming that the defendants, and young Paul Westphal in particular, did resort to artifice and fraud for the very purpose of producing the impression that they and the defendant corporation were manufacturers of the original Westphal's hair tonic.  In the record there is abundant evidence showing an intention on the part of the defendants to mislead the public, and that the public was misled by the defendants' acts.  In the second case relied upon by Presiding Justice INGRAHAM (*World's D. M. Assn.* v. *Pierce*, 203 N. Y. 419) the Court of Appeals said (at p. 424): " It is a general principle of law that one's name is his property, and he has the same right to its use and enjoyment as he has to that of any other species of property. [Citing authorities.]  It is, however, also a general principle of law that no man has the right to sell his products or goods as those of another.  He may not through unfairness, artifice, misrepresentation or fraud injure the business of another or induce the public to believe his product is the product of that other.  The law

protects the honest dealer in the business which fairly is his, and the public from deception in trade."

In the third case cited in the dissenting opinion of Presiding Justice INGRAHAM in *Merritt Burial & Cremation Co.* v. *Merritt Co.* (*Donnell* v. *Herring-Hall-Marvin Safe Company*, 208 U. S. 267) the United States Supreme Court said (at p. 272): "The good will sold was that of Hall's Safe and Lock Company. There is nothing to show that while that company was going the sons of Joseph L. Hall could not have set up in business as safe makers under their own name and could not have called their safes by their own name, *subject only to the duty not to mislead the public into supposing when it bought from them that it was buying their father's safes.*" (Italics are the writer's.)

Thus, in *Donnell* v. *Herring-Hall-Marvin Safe Company*, the facts are distinguishable from those in the case at bar, and the decision there supports the judgment appealed from here. All that the judgment appealed from restrained the defendants from doing was from the manufacture, sale or dealing in hair tonics or other barbers' supplies, within this State or elsewhere, under the name of Westphal, Paul Westphal, Westphal's, Paul Westphal Co., Westphal's World's Best Corporation, or any of the said names, or using said name of Westphal either alone or in conjunction with other words or symbols, or in any manner, within the State of New York or elsewhere, *in connection with the hair tonic or barbers' supply business.* The judgment appealed from merely enjoins the defendants from the use of the name "Westphal's" in connection with the hair tonic or barbers' supply business. They may engage in any other business using that name, or they may manufacture and sell hair tonic, but if they do they must not use the name "Westphal's" in connection with such business. In the case of *Merritt Burial & Cremation Co.* v. *Merritt Co.* (*supra*), upon which a minority of this court bases its dissent, the injunction granted at Special Term was upheld in so far as it restrained the defendant corporation from using the name "Stephen Merritt Company" in connection with the undertaking business. Presiding Justice INGRAHAM said (at p. 575): "I think there is evidence to justify the court in enjoining the defendant corporation from using its name in the undertaking business, as showing that it was used with the intention of unfairly competing with the plaintiff's business and an injunction to that extent was justified by the evidence."

In the Court of Appeals (214 N. Y. 676, at p. 677) the judgment in the *Merritt* case was modified in the following memorandum: "Judgment modified on the dissenting opinion of INGRAHAM, P. J., below, by striking out all the injunctive provisions thereof *except*

*the single provision enjoining the defendant corporation from using the name Stephen Merritt Company in the undertaking business."* (Italics are the writer's.)

All that the defendants are restrained and enjoined from doing in the case at bar is from manufacturing, selling or dealing in hair tonics or barbers' supplies under the name of Westphal, or any other name where the name " Westphal " is used alone or in conjunction with other words or symbols. The dissenting opinion of Presiding Justice INGRAHAM in the *Merritt Case (supra)*, adopted by the Court of Appeals, and the authorities relied upon by the learned presiding justice in support of a modification of the injunction there granted, short of requiring any modification of the judgment in the case at bar, amply justify the injunctive relief granted the plaintiff herein.

We are of the opinion that, under the circumstances of the case at bar as revealed by the record, the court below properly restrained the use by the defendants of the name " Westphal " in connection with the manufacture and sale of hair tonic, and that where, as in the case at bar, it clearly appears that defendants' use of that name was for the dishonest purpose of obtaining from the plaintiff that for which it had labored for long years and for which it had spent a large amount of money in advertising, and for the purpose of deceiving the public into the belief that the defendants were engaged in the manufacture and sale of plaintiff's well-known preparation, the defendants should be restrained. The past conduct of young Paul Westphal and those associated with him has been such as to convince us that by nothing short of the injunction contained in the judgment appealed from will the plaintiff receive adequate protection.

The judgment should be affirmed, with costs to the plaintiff, respondent, against the defendants, appellants.

DOWLING and MARTIN, JJ., concur; CLARKE, P. J., and FINCH, J., dissent.

CLARKE, P. J. (dissenting). The injunction is too broad. It absolutely restrains the use by defendant Westphal of his own name. This may not be done. (*Merritt Burial & Cremation Co. v. Merritt Co.*, 155 App. Div. 565; mod. on dissenting opinion of INGRAHAM, P. J., 214 N. Y. 676.)

FINCH, J., concurs.

Judgment affirmed, with costs.