**AMERICAN CHICLE CO.**

**v.**

**TOPPS CHEWING GUM, Inc., et al.**

**No. 145, Docket 22856.**

United States Court of Appeals
Second Circuit.

Argued Jan. 14, 1954.

Decided March 4, 1954.

W. Lee Helms, Nims, Martin, Halliday, Whitman & Williamson, New York City, A. J. Nydick, New York City, of counsel, for plaintiff-appellant-appellee.

George E. Middleton, Pennie, Edmonds, Morton, Barrows & Taylor, New York City, Hubert G. Moore, Jr., New York City, of counsel, for defendants-appellants-appellees.

Before FRANK, MEDINA and HINCKS, Circuit Judges.

FRANK, Circuit Judge.

The District Court found defendants guilty of unfair competition, and accordingly enjoined them from marketing "Clor-Aids" in a package similar to plaintiff's "Clorets." We affirm that part of the judgment on the opinion below, 112 F.Supp. 848 at page 850.

The District Court also held that defendants' trade-name "Clor-Aid" does not infringe plaintiff's trade-name "Clorets." We agree. Since (thanks to the great popularity of chlorophyll products) the word "Clor" is common to the trade,[1] it cannot be used as a basis for finding

1. See 112 F.Supp. at page 849.

trade-mark infringement. Significant here is the acquiescence of plaintiff's predecessor in the use of the name "Clor-odets." [2] For while there is a marked likeness between "—dets" and "—ets," there is little, if any, similarity between "—aid" and "—et" in English pronunciation. However, plaintiff, selling in both a national and international market, argues that Clor-Aids and Clorets sound alike in French, and charges that defendants chose the trade-name "Clor-Aid" to capitalize on the popularity of plaintiff's product in French-speaking countries. But the principal market at which defendants aimed was in the United States. That fact, plus the difficulties of choosing an effective trade-name in this era of brand merchandising and mass media advertising, leave it highly unlikely that defendants chose the name "Clor-Aid" for the purpose of winning away plaintiff's French-speaking customers.[3]

It has been suggested, however, that, because they had the deliberate intention of palming off, through the use of the imitative package,[4] the defendants, although their trade-mark does not in-

fringe plaintiff's, nevertheless should be enjoined from using the name Clor-Aid. In support of this proposition, the case of Mainzer v. Gruberth, 237 App.Div. 89, 260 N.Y.S. 694, 698, has been cited. There the plaintiff produced a baking product under the registered trade-name "Apricoating" which it packaged and sold with a distinctive yellow label bearing the picture of a baker. Defendants copied plaintiff's package style and label, using a picture of a baker and the same words which plaintiff for so many years had used on its own labels. In addition, defendants chose, as a trade-name for their product, the name "Apricot Coating." The court enjoined defendant's use of this obviously copied package design and label. Defendant's use of its trade-name "Apricot Coating" was likewise enjoined—not at all because of the defendant's misconduct in deliberate copying of the plaintiff's package and label but solely because the defendant had used the name "Apricot Coating" in deliberate imitation of plaintiff's name "Apricoating" which, by plaintiff's activities, had attained a secondary meaning. In enjoining defendants from fur-

2. See the discussion of this matter in 112 F.Supp. at page 849.

3. Defendant, in its brief, answers as follows plaintiff's charges that (1) Clorets and Clor-Aids sound alike in French, and (2) defendants deliberately chose the name Clor-Aid to deprive plaintiff of its French-speaking market:

"*Les Prononciations en Français*

"En français le mot 'clorets' peut être prononcé 'cloray,' et le mot 'chiclets' peut être prononcé 'sheeklay.' D'autre part, la marque de fabrique Clorets, est-elle prononcée 'clo-ray,' et la marque de fabrique Chiclets, est-elle prononcée 'sheeklay'? Mais non. There is not a shred of evidence that any customer ever entered une confiserie in New Orleans, Quebec, Paris or Madagascar and, addressing Monsieur le Propriétaire, said: 'Donnez-moi, s'il vous plaît, un paquet de Clo-ray.' Au contraire, plaintiff knows—but now forgets—that even Frenchmen chew Clorets. (That is, where Topps' Clor-Aid is not purveyed.) And if any Frenchman, by some strange mischance, *should* ask for Clo-ray or Sheek-lay, no one would be more surprised—or cha-

grined—than plaintiff, whose policy it is to have its trade-marks given their American pronunciations, even in the uttermost parts of the earth. * * *

"Any resemblance between the pronunciations of Clorets and Clor-Aid in any language, living or dead, is purely coincidental. It is hard enough to choose a word mark to be pronounced in plain American. If, in addition, a trader must consider how his mark *may be* pronounced in parts of Louisiana, New Mexico, Minnesota and Pennsylvania (not to mention Mott Street), in Paris, France, as well as in Paris, Kentucky, a difficult task will have been made impossible."

4. In advertising Clor-Aid, defendants sent out a streamer with the legend "Now 10¢." The District Court found that this "could only mean one thing and that was to rivet the attention of the buyer on the thought that he was now getting something for 10¢ that had previously cost more, i. e., the 15¢ package of the plaintiff." Accordingly, the court held that defendants had unfairly tried to pass off their own goods as plaintiff's.

ther use of the name "Apricot Coating," the court said, "Such unfair use of the *same or similar words* by a competitor will be restrained by injunction  * * ".[5] It appears, then, that the injunction against defendants, in so far as it prohibited the use of their trade-name "Apricot Coating," rested clearly upon a finding of sameness or similarity in the two trade-names and thus, upon intentional copying of plaintiff's trade-name. As a consequence, defendants were properly enjoined from unfair competition in both (1) the use of similar packages and labels and (2) the use of a trade-name which infringed plaintiff's.

In that context, the court said: "When unfair competition is so designedly accomplished, all opportunity to continue it in any form should be prevented by an injunction sufficiently broad to insure such a result." To extend that language as suggested—so that (a) unfair competition in copying a package justifies an injunction against (b) what would otherwise be a legitimate use of an uncopied name—is to ignore well-settled doctrine. "It is," said Chief Justice Marshall in a much quoted statement in Cohens v. Virginia, 6 Wheat. 264, 398, 5 L.Ed. 257, "a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided but their possible bearing on all other cases is seldom completely investigated."

The holding in Mainzer v. Gruberth is in accord with the precedents which hold that a plaintiff in such circumstances is entitled to an injunction which will free him of harm resulting from so much of defendant's threatened future conduct as constitutes unfair competition but to no more. For the issuance of an injunction against the use of a non-infringing, non-similar, trade-name on the sole ground that defendant wilfully copied plaintiff's package could only be rationalized on a theory that equity uses an injunction to punish past misconduct. But that theory the United States Supreme Court and the New York courts have rejected. See e. g., Hecht Company v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 592, 88 L.Ed. 754: "The historic injunctive process was designed to deter, not to punish."[6] See also May's Furs and Ready-to-Wear, Inc., v. Bauer, 282 N.Y. 331, 343, 26 N.E.2d 279, 284: "It has often been said by the courts of this State than an injunction is protection for the future and not punishment for the past." With particular reference to unfair competition, see Warner & Company v. Eli Lilly & Co., 265 U.S. 526, 532, 44 S.Ct. 615, 618, 68 L.Ed. 1161, where the Court said: "If petitioner had been content to manufacture the preparation and let it make its own way in the field of open and fair competition, there would be nothing more to be said. It was not thus content, however, but availed itself of unfair means, either expressly or tacitly, to impose its preparation on the ultimate purchaser as and for the product of respondent. Nevertheless, the right to which respondent is entitled is that of being protected

---

5. Emphasis added.

6. See also, e. g., Di Giovanni v. Camden Fire Ins. Ass'n, 296 U.S. 64, 71–72, 56 S.Ct. 1, 80 L.Ed. 47; Minneapolis & St. L. Ry. Co. v. Pacific Gamble Robinson Co., 8 Cir., 181 F.2d 812, 814; Hygrade Food Products Corp. v. United States, 8 Cir., 170 F.2d 816, 818; McComb v. Goldblatt Bros., 7 Cir., 166 F.2d 387, 390; Walling v. T. Buettner & Co., 7 Cir., 133 F.2d 306, 308.

Since neither party suggests that the legal rules in other jurisdictions differ from New York's, we need not consider the difficult problem which might otherwise arise in a suit based on alleged multi-state unfair competition.

against unfair competition, not of having the aid of a decree to create or support, or assist in creating or supporting, a monopoly of the sale of a preparation which every one, including petitioner, is free to make and vend. The legal wrong does not consist in the mere use of chocolate as an ingredient, but in the unfair and fraudulent advantage which is taken of such use to pass off the product as that of respondent. The use dissociated from the fraud is entirely lawful, and it is against the fraud that the injunction lies."

Affirmed.

MEDINA, Circuit Judge (dissenting).

Even were defendant's simulation of plaintiff's package done innocently and in good faith plaintiff would be entitled to the injunction granted by the trial court. See John H. Woodbury, Inc., v. William A. Woodbury Corp., D.C.S.D. N.Y., 1938, 23 F.Supp. 162, quoting from Coty, Inc., v. Parfums De Grande Luxe, Inc., 2 Cir., 1924, 298 F. 865, 870; Handler & Pickett, "Trade-Marks and Trade Names—An Analysis and Synthesis: II," 30 Col.L.Rev. 759, 769–77 (1930). But here we have a deliberate fraud by an habitual offender and the remedy should be sufficiently drastic to prevent any further filching of plaintiff's customers. "A defendant whose business enterprise is based upon express and deliberate fraud will not find a court of equity strenuous to preserve all rights he might have had if his conduct and motives had been honest." Peninsular Chemical Co. v. Levinson, 6 Cir., 1917, 247 F. 658, 663.

In American Chicle Company v. Topps Chewing Gum, Inc., 2 Cir., 1953, 208 F. 2d 560, this Court affirmed a judgment restraining this same defendant from continuing to use a package deliberately designed to attract buyers of plaintiff's Chiclets. Concerning defendant's conduct, Judge Learned Hand wrote 208 F. 2d at pages 562–563:

"It would be absurd to see in this anything but a hope to bring to its own net just those buyers who are on the fringe of the plaintiff's pos-

sible customers. * * * Indeed, it is generally true that, as soon as we see that a second comer in a market has, for no reason that he can assign, plagiarized the 'make-up' of an earlier comer, we need no more; for he at any rate thinks that any differentia he adds will not, or at least may not, prevent the diversion and we are content to accept his forecast that he is 'likely' to succeed. Then we feel bound to compel him to exercise his ingenuity in quarters further afield."

Defendant's new scheme to appropriate to its own use plaintiff's customers and good will in relation to Clorets must be viewed as an integral whole, and against the background of the conduct just described. The package, together with the name "Clor-aid," has, for a very considerable period of time, been used to accomplish defendant's illegal purpose. There is only one way effectively to compel defendant to exercise its "ingenuity in quarters further afield," and that is to enjoin all further use of the scheme, lock, stock and barrel. Otherwise, there will be the usual making of a few minor changes in design, leading to further proceedings and perhaps further changes. This is the course pursued by the typical infringer, and it closely resembles efforts to escape the effect of cease and desist orders of the Federal Trade Commission relative to false and misleading practices of one kind or another. The basis for numerous decrees in antitrust cases, where the entire scheme is enjoined, and not merely the patently illegal features, is that equity will fashion its decrees in such a manner as definitely to put a stop to the monopoly or restraint of trade under attack. There is no reason perceptible to me why the courts should treat an habitual infringer more leniently. This is not by way of punishment or the imposition of any penalty. It is no more than the exercise of plain common sense in order to make a decree which shall accomplish its purpose. The more cunningly devised and specious the scheme or plan, the more

alert should the courts be to stamp it out. Otherwise, the honest merchant is at the mercy of an unscrupulous competitor. Surely there is enough before us here to show that this defendant cannot be trusted.

These views find ample support in the authorities. The principle involved is clearly stated in Mainzer, Inc. v. Gruberth, 1st Dept., 1932, 237 App.Div. 89, 260 N.Y.S. 694, 698–699, affirmed 262 N.Y. 484, 188 N.E. 30, as follows:

"Cases of unfair competition present varying degrees of wrongdoing. There is a distinction between those where one accidently uses a label or design owned by another, or where there has been an honest mistake, and those where there has been a deliberate attempt to appropriate a trade-mark, label, or design, or the business of a competitor.

"In the interest of common honesty and fair dealing, the courts naturally frown upon such practices. The bold attempt to take away the business of another by adopting the trade-marks, even to the extent of adopting the color, size, and form of packages in which the goods are sold, indicates to what extreme some of our modern businessmen will resort. When unfair competition is so designedly accomplished, all opportunity to continue it in any form should be prevented by an injunction sufficiently broad to insure such a result."

Where a defendant's past conduct has convinced the court that nothing short of such an injunction would give plaintiff adequate protection, a competitor has been enjoined from all use of his own personal name in his business. Westphal v. Westphal's World's Best Corp., 1st Dept., 1926, 216 App.Div. 53, 215 N.Y.S. 4, affirmed 243 N.Y. 639, 154 N. E. 638.

As Justice Holmes wrote, in Schlitz Brewing Co. v. Houston Ice & Brewing Co., 1919, 250 U.S. 28, 29, 39 S.Ct. 401, 63 L.Ed. 822, "It is a fallacy to break the fagot stick by stick."

Accordingly, I would modify the judgment below by broadening the terms of the injunction and restraining the use of the name "Clor-aid."