JOHN H. WOODBURY, Inc., v. WILLIAM A. WOODBURY CORPORATION et al.*

District Court, S. D. New York. Jan. 31, 1938.

*For supplemental opinion, see 23 F.Supp. 768.

Edward S. Rogers and John C. Pemberton, both of New York City (Edward S. Rogers, John C. Pemberton, and Clifton Cooper, all of New York City, of counsel), for plaintiff.

Isaac Reiss, of New York City (Arthur A. J. Weglein, Isaac Reiss, and Elliot Paley, all of New York City, of counsel), for defendant Woodbury Corporation.

KNOX, District Judge.

John H. Woodbury, Inc., nationally advertised distributor of "Woodbury's Facial Soap," here seeks an injunction against the use of the name "Woodbury," in connection with toilet goods manufactured and retailed by the defendants. The suit is predicated upon defendants' alleged unfair competition and trade-mark infringement. Plaintiff bases its exclusive right to the surname Woodbury on three distinct series of transfers extending back to 1901.

In that year, John H. Woodbury and the John H. Woodbury Dermatological Institute sold to the Jergens Company, a predecessor in interest of the plaintiff, all the rights *in the neckless head trade-mark,* which identified John H. Woodbury's Facial Soap, *and in the name "Woodbury,"* in connection with the manufacture and sale of eight specified toilet articles, including the well-known soap. For a more extended account of this transaction, see Andrew Jergens Co. v. Bonded Products Corporation, 2 Cir., 21 F.2d 419. The rights, acquired by the Jergens Company, through mesne assignments, are now vested in the plaintiff.

Following this contract of 1901, John H. Woodbury left the Institute and engaged in the manufacture of soap, under his own name, and by means of a company known as the Woodbury-McGrath Company. In 1907, the Jergens Company brought suit in the New York state courts to enjoin this competition, and prevailed. Andrew Jurgens Co. v. John H. Woodbury, 56 Misc. 404, 106 N.Y.S. 571; Andrew Jergens Co. v. John H. Woodbury, 128 App.Div. 924, 112 N.Y.S. 1121, modified 197 N.Y. 66, 90 N.E. 344, reargument denied 197 N.Y. 581, 91 N.E. 1109. After this setback, and within the limits of the decision of the Court of Appeals, the John H. Woodbury Company of New York was organized by John H. Woodbury and Peyton R. McCargo, for the purpose of carrying on business in toilet goods, other than facial soap.

In 1909, John H. Woodbury died, and the residual rights to use his name were transferred to the corporation bearing his name by his duly appointed administrators. In 1925, McCargo acquired the stock of the John H. Woodbury Company, subsequently selling it by means of two separate transfers, dated October 3, 1925, and November 15, 1928, to Benjamin H. Freedman. The stock acquired under the first of these transfers, Freedman assigned to "John H. Woodbury and John H. Woodbury, Laboratories, Inc.," which he had lately incorporated, and controlled. These Laboratories continued and developed the business of the former John H. Woodbury Company until 1929, at which time the Jergens interests and then the plaintiff acquired its rights.

William A. Woodbury, whose name is borne by two of the defendant companies, was a cousin of John H. Woodbury. From 1899 to 1905, he worked in the Dermatological Institute, apparently in the capacity of a "general manager with more or less supervision over all the departments * * *, but in charge particularly of its advertising." Cf. Andrew Jergens Co. v. Woodbury Inc., D.C., 273 F. 952, 963. In 1905, he started his own business and formed the Woodbury Company of New York to which the Dermatological Institute assigned all its rights in the neckless head trade-mark not previously granted, but reserving to itself a concurrent use of the mark as long as it remained in business. Following the bankruptcy of the Institute in 1908, William A. Wood-

bury began the publication of a series of lessons, books, and pamphlets on beauty culture. These activities from 1918 to 1921 were conducted by Woodbury System, Inc. At the same time, due to the demand of his readers for toilet preparations bearing his name, the Woodbury Company of New York promoted the manufacture and sale of products which he, from time to time, either by himself or through others, prepared and compounded. The business done, however, seems not to have been of extensive proportions.

About 1917, it is claimed, this latter phase of the business became increasingly important, and three corporations were chartered to further its growth, viz., Woodbury, Inc.; William A. Woodbury Distributors, Inc.; and the Woodbury Dermatological Institute, Inc. William A. Woodbury owned stock in these corporations, generally with the understanding that it was given him for the use of his name. The mere fact that he did not receive cash for such use is of no moment. So far as I am able to interpret the testimony, my thought is that the greatest contribution which William A. Woodbury made to any one of the corporations with which he was identified subsequent to his connection with John H. Woodbury and the Institute was the use of his name. The fact that he was given corporate stock, rather than cash, would indicate that the persons in control of such corporations were unwilling to give him something of recognizable tangibility until the use of his name had resulted in profit to the companies which were capitalizing it.

In June 1919, the Andrew Jergens Company of Ohio brought suit in Delaware to enjoin Woodbury, Inc., Woodbury System, Inc., and Woodbury Distributors, Inc., from infringing trade-mark rights derived in 1901 from the Institute. The court held that Jergens' right to the trade-mark and name "Woodbury" in conjunction therewith, acquired in 1901, was absolute only with respect to the eight articles specified, and that William A. Woodbury, having built up a toilet goods business, was entitled to use his name in that business, and that this right could be conferred upon a corporation, so long as the packaging of articles analogous to the eight previously singled out was not so similar as to "deceive and mislead the public to believe that they are identical with those named in the contract" of 1901. Although confusion

existed, since it was found not to "arise from any wrongful act of the defendants" the bill was dismissed. Andrew Jergens Co. v. Woodbury, Inc., D.C., 273 F. 952, affirmed without opinion, 3 Cir., 279 F. 1016.

The claim of defendants is that this decision should rule the result of the action at bar. It must be noted, however, that that determination turned upon the trademark rights under the contract of 1901, and not upon any question of secondary significance in the surname. Such, at least, was the finding of Judge Inch, in the subsequent Bonded Products Case, and I concur in it.

On May 29, 1918, and shortly before the institution of the Delaware suit, William A. Woodbury and the Woodbury Company of New York transferred to Roswell F. Easton an exclusive right and privilege to sell or dispose of the commodities and formulæ set forth in such license, excepting therefrom, however, commodities controlled by the Andrew Jergens Company, and which were covered by the contract of 1901. The right and privilege so conveyed was to be in force for 999 years. One of the provisions was that Easton should have the right to use the name "William A. Woodbury," or "Woodbury," and the neckless head trade-mark, upon all toilet articles covered by the agreement.

On June 5, 1918, Easton, through an indorsement upon the original agreement, transferred his right, title, and interest therein to William A. Woodbury Distributors, Inc., in which Woodbury had one share of stock. When Easton was served with process in the Delaware suit, he handed the papers to Woodbury, telling him to take care of them.

Thereupon, Easton appears to have abandoned the Distributors, which it may be added, had paid no royalties, excepting those due for the first quarter year of the arrangement, to either William A. Woodbury, or the Woodbury Company. Shortly after Easton's desertion of the Distributors, William A. Woodbury, at least such is his testimony, sent a registered letter to Easton wherein he undertook to cancel the license previously granted by the Distributors upon the ground that it was in default in making payments under the agreement. In 1921, the Distributors corporation was dissolved for nonpayment of taxes. The succeeding year, a similar fate overtook Woodbury, Inc. The Woodbury Company of New York, however, continued in business until 1929, and William A. Woodbury attended its meetings, being reelected a director, as well as treasurer, on September 13, 1921, and again a director on January 9, 1922. The business as a whole, however, was left to C. Palmer Woodbury and Edward D. Chaplin.

Following the evil days which came to the Distributors, William A. Woodbury began to reorganize the toilet goods line for his own account and thereafter, with the possible exception of handling a few orders for a particular lotion, did not use the Woodbury Company in the exploitation of his products. As Mr. Woodbury admits, he is not much of a salesman, and it was not long before goods bearing his name came to be marketed by the Bonded Products Corporation.

Towards the end of the year 1925, the Jergens Company brought suit against that organization charging unfair competition. In the main, plaintiff based its case upon the rights which had come to it in 1901, from the original Institute. Neither William A. Woodbury nor any corporation bearing his name was a party defendant in that action. Statement should also be made that the court made no adjudication as respects the agreements that had previously been made with Easton and William A. Woodbury Distributors, Inc. Furthermore, nothing was decided concerning the devolution of rights thereunder as a result of Woodbury's cancellation of the lease to Easton. In due course, Bonded Products Corporation was restrained from selling soap in such manner as would constitute a representation that its products were in any way connected with the original "Woodbury's Facial Soap." The decree also required a statement that the original facial soap was being manufactured by the Andrew Jergens Company. Andrew Jergens Co. v. Bonded Products Corporation, D.C., 13 F.2d 417, modified, 2 Cir., 21 F.2d 419, certiorari denied 275 U.S. 572, 48 S.Ct. 204, 72 L.Ed. 432.

During the progress of this litigation, and upon October 3, 1925, Benjamin H. Freedman purchased the stock of the Woodbury Company and William A. Woodbury Distributors, Inc., and finally, on or about November 29, 1929, all of the outstanding stock of these companies, or at least control thereof, came into the ownership of the Andrew Jergens Company. On January 5, 1926, the Woodbury Company

of New York assigned to "John H. Woodbury and The John H. Woodbury Laboratories, Inc.," all rights which it had derived from the Institute in 1905. It seems to me that this transfer included all rights and good will which had attached to the surname "Woodbury" or "Woodbury's." These rights I think are now vested in plaintiff.

The adverse effect of the decision in the case of Andrew Jergens Co. v. Bonded Products Corporation made it difficult for William A. Woodbury to carry on business. Toward the end of 1926, and pending an appeal from the decree of the lower court, Woodbury succeeded in enlisting the aid of Edward L. Stasse, a long-time friend, who was Deputy Surrogate of Essex County, New Jersey. Judge Stasse proceeded to interest some of his friends in the proposal of Woodbury, with the result that the Woodbury Company of New Jersey came into existence. In the course of its existence, the backers of the enterprise contributed $100,000 to its treasury. This organization, with which Woodbury was concerned, and to which he gave his formulae and advice, undertook to carry on the toilet goods business on rather a large scale. The effort continued until about 1930 when, unable longer to withstand competitive conditions created by older, larger, and wealthier concerns, the company ceased to operate.

At this juncture, attention should be called to the fact that when Benjamin H. Freedman attempted the acquisition of rights to the use of the Woodbury names, he sought to buy such rights therein as might be possessed by William A. Woodbury. In connection therewith, he approached Judge Stasse and negotiated with him. Matters proceeded so far that a tentative agreement was drawn whereby Woodbury was to receive substantial compensation. The suggested arrangement was not consummated, and Woodbury continued with the Woodbury Company of New Jersey.

After The Woodbury Company of New Jersey ceased to do business, toilet goods bearing the name of William A. Woodbury came to be handled by William A. Woodbury Corporation and William A. Woodbury Sales Co., Inc., defendants herein, the other defendants, through manufacture or sale, contributing thereto.

Following plaintiff's acquisition of such rights in the Woodbury name as finally came to it, an expensive and widespread advertising campaign, designed to bring plaintiff's preparations before the public, was launched. In addition to the use of magazines and newspapers, plaintiff resorted to frequent radio broadcasts wherein it purchased the assistance of persons well known to and popular with many listeners of the broadcasting companies. Plaintiff, in addition, added about fifteen new products to its line of toilet goods. Over the years 1930 to 1936, $2,682,410 were spent in advertising facial creams, powders, and like preparations, and $3,910,120 were expended for soap, whereas prior to 1930 the sales and advertising were confined almost entirely to the soap. General sales in the same period had risen from $2,389,507 to $7,447,547 yearly. Of this increase only $1,508,117 were attributable to soap. In this growth the plaintiff company has obviously been annoyed, if not greatly hampered, in its expanded field, by the activities of William A. Woodbury and the defendant corporations. The present claim of plaintiff is that the name "Woodbury" on toilet goods has come to connote its products, and not those of the defendants, and that in any event it now possesses all rights in the surname.

In addition to the asserted unfair competition on the part of defendants, plaintiff complains of their infringement of trade-marks Nos. 101,612, 112,426, and 305,546. Defendants set up no conflicting registered trade-marks. Nor can they assert priority in the use of the name "Woodbury." The record shows that if any significance were to be attached to the mere surname as a valid technical trade-mark, (and as will presently be seen this cannot be done), John H. Woodbury preceded his cousin in the field of soap and of at least certain toilet goods by a quarter of a century. We turn therefore to the validity of plaintiff's marks.

Two of plaintiff's marks (register Nos. 101,612 and 305,546) consist simply of the name "Woodbury's" printed in a peculiar manner. They fall within the exceptions to the third proviso of 15 U.S.C.A. § 85(b) and were properly registered. It is well established, however, that the mere name of an individual cannot become a valid technical trade-mark, and plaintiff, merely by the registration of the name, could not obtain even a prima facie title to its use, as such, as a trade-mark or tradename. Charles Broadway Rouss, Inc., v.

Winchester Co., 2 Cir., 300 F. 706, 712; Derenberg, Trademark Protection and Unfair Trading, 1936, pp. 278-292.

Nor can it be said that "Woodbury" is a valid trade-mark within the purview of the ten-year proviso of the statute, because from 1895 to 1905 the Institute never once used that surname singly, and except in conjunction with the neckless head. While the name has been used in connection with toilet goods ever since the date of its first use by John H. Woodbury, there is no evidence in this case that prior to 1905 the public ever asked for these toilet goods by the mere surname of the manufacturer, as is done today. The specification of John H. Woodbury, accompanying the first registration, and which declared that he advanced no claim as to the name without the neckless head, indicates that at *that* time the head, and not the name, was the essential characteristic of the trade-mark.

Plaintiff's third mark (register No. 112,426), uses the surname together with the neckless head of John H. Woodbury. No claim is here made that the neckless head has been used either by William A. Woodbury or by any of the defendants. As to the neckless head portion of the mark, there can be no infringement.

The cause of action in relation to the registered name "Woodbury," therefore, must rest entirely on proof of secondary significance. The name, being registered under the provisions of the federal statute, this court, in any event, has jurisdiction of the case, regardless of diversity of citizenship. Thaddeus Davids Co. v. Davids Mfg. Co., 233 U.S. 461, 471, 34 S.Ct. 648, 58 L. Ed. 1046, Ann.Cas.1915B, 322; Nims, Unfair Competition and Trademarks, 3d Ed. 1929, § 206. This, however, may be passed in that, diversity of citizenship exists between plaintiff and the defendants.

On the issue of unfair competition, defendants claim, as previously stated, that the matter before this court has already been decided in the Delaware case, and that that decision is res adjudicata here. In this, defendants are in error. The same contention was advanced before the Circuit Court of Appeals in the Bonded Products Case and rejected in the following pungent language: "Even if it were conceded that the case held that what Woodbury was *then* doing was not calculated to deceive the public into supposing that he was sell-

ing plaintiff's facial soap, it is difficult to see how that could be conclusive of the issue whether what he is *now* doing is so calculated to deceive. It has been frequently said that, in controversies of this character, *each case must, in a measure, be a law unto itself.* * * *"* (Italics mine.) 21 F.2d 419, at page 423.

The labels, pamphlets, and packages, the method of selling, the products themselves, differ completely from the methods employed by William A. Woodbury in 1921 when the Delaware litigation arose. Furthermore, plaintiff's case rests in large part on the secondary significance which its products have acquired since the purchase of the rights of the Laboratories in 1929. The issues raised by the present pleadings, therefore, must be considered anew. Here, as in the Bonded Products Case (page 423), "it is still open, upon proof of facts, for a court of equity to ascertain whether or not a Woodbury, by himself or through another, is deceiving the public into thinking" that his products are plaintiff's or a new brand thereof.

The testimony and exhibits reveal that the packages of the competing companies are quite dissimilar. The essence of the complaint is that defendants' goods have been manufactured and sold under the name "Woodbury's" to which appellation plaintiff claims an exclusive privilege and right of exploitation. Such confusion, to some extent, has been occasioned by plaintiff itself. Through the expansion of its line of products, and the widespread advertising thereof, the name "Woodbury's" has been made familiar to untold thousands of persons, and it has thus encroached, as it was rightfully privileged to do, upon the preserves wherein William A. Woodbury, for many years, has feebly, but continuously, sought a livelihood.

During this period, neither he nor his associates have been eager to avoid such benefit as might accrue to them as a result of public belief that their products emanated from the successor to the John H. Woodbury fame and good will. While, in these cases, the defendants have nowhere affirmatively represented themselves to be connected with the original Institute, or the makers of "Woodbury's Facial Soap," they have been far from careful in seeing to it that such was not the impression made upon the public.

On certain of defendants' packages, the following appears: "* * * The result

of deep research by William A. Woodbury, author of the following textbooks: 'Care of the Face,' 'Care of the Hands,' and 'Care of the Hair and Scalp.'" And on some of the leaflets used by department stores in 1934, in connection with goods made by the defendant, William A. Woodbury is styled as a "dermatologist" and "The Father of Beauty Culture." As to the ethics of such designations, the words of Judge Inch in the Bonded Products Case are relevant: "I suppose anybody can call himself a 'famous author' or 'dermatologist,' although a greater portion of the time he had been engaged in advertising. It is likewise natural, perhaps, to hold in high regard, and keep same before the public a cousin who had become famous as a soap seller; *but if the result is that 'the public' confuses the 'cousins' and confused the 'dermatologists,' there would seem to be a necessity for a plain statement of 'who is who,' so that there need be no confusion whatever in a purchaser's mind, as to the source of soap now offered him."* (Italics mine.) 13 F.2d 417, page 425.

Shortly before this suit was brought, circulars, identified by Picard, vice president of the defendant Sales Company, and which he authorized, were distributed, in which assertion was made that defendants had a perfect right to the use of the name "Woodbury" in the sale of toilet goods and cases were cited in support of this belief. The Bonded Products' decision, however, the most recent and authoritative decision on the question, was omitted. This, clearly, was unjustifiable.

The evidence further reveals that confusion in the public mind has been created by the activities of the "pitchmen" and other persons who have engaged in the distribution of defendants' goods. Responsibility for these acts is disclaimed on the ground that they could not be controlled. Picard, however, admitted the issuance of a circular which left the style of advertising defendants' goods to the sole discretion of the advertiser. In effect, this was an authorization to act as they foreseeably might do and actually did, viz., identify defendants' products, as having origin with the plaintiff. Pursuant to this circular, many advertisements appeared throughout the country, emphasizing the surname *without* the qualifying words "William A." Defendants point to numerous letters which they thereupon sent out requesting that the full name, "William A. Woodbury," at all times be used in advertising matter. But it cannot be denied that considerable confusion between plaintiff's and defendants' goods was created. Confronted with these facts, defendants fall back on the dicta of Judge Morris in the Delaware litigation, and would have this court hold that "confusion" in the use of a surname is permissible, as long as it is not accompanied by wilful "deception." Whatever may have been the law in a more individualistic era, it is now well settled in this circuit that proof of actual fraudulent intent is not required, "where the necessary and probable tendency of defendant's conduct is to deceive the public and pass off his goods as and for those of the plaintiff." Coty, Inc., v. Parfums De Grande Luxe, 2 Cir., 298 F. 865, 870; Charles Broadway Rouss, Inc., v. Winchester Co., supra; Derenberg, Op.Cit., pp. 734–741; Nims, op. cit., § 351. The fact that a properly registered name may have the protection of a statute removes any possible doubt in the matter. Cf. *Thaddeus Davids Co. v. Davids Mfg. Co.*, supra.

Regardless of whether or not defendants actually *intended* to deceive, the law declares that a manufacturer who furnishes a dealer with the means of creating confusion in the public mind is guilty of unfair competition, although he did not actively participate in the dealer's fraud. Cf. *Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526, 530, 44 S.Ct. 615, 617, 68 L.Ed. 1161, and cases there cited.

Confusion being established beyond all doubt, should the injunction be qualified or absolute?

Plaintiff contends that, after William A. Woodbury authorized the use of his surname to Easton, without reserving the right of revocation of such authority, and since these rights were assigned to the Distributors and no retransfer of these rights occurred, William A. Woodbury lost *forever* the right to use his name in the trade. To this conclusion I cannot give assent. While the license in question contemplated relations of long duration between the Woodbury Company and Easton's corporation, the Distributors, a reasonable construction of its terms requires that there be read into them the qualification that the authority would terminate as and when the licensee should default upon

the provisions of the license to which he was obligated.

There is credible testimony in the record to show that Easton failed to make royalty payments as stipulated in the agreement, whereupon William A. Woodbury sent him and the Distributors a letter stating that the contract was at an end. The rights thereby reverted to the lessors. For aught that appears; William A. Woodbury never sold nor assigned to the Woodbury Company of New York the right to use his name in connection with its business. It would seem, therefore, that William A. Woodbury became the recipient of the reversion as to *those* rights and that the Woodbury Company, on its part, received back from Easton and his company the rights in the *Woodbury trademark,* in particular, those originally derived from the Institute by the contract of 1905. After the dissolution of the Distributors in 1921, its stock was bought up by Freedman, but all of its rights under the 1918 license were not thereby acquired. By the contract of 1926, between the Woodbury Company of New York and the Laboratories, the latter obtained the rights to the trademark and the good will attaching to the surname as part of the trademark, *but not* that which inhered in the name of William A. Woodbury. These rights acquired by the Laboratories passed along to the Andrew Jergens Company in 1929.

If it be, as I think is true, that William A. Woodbury, when he made his agreement with Easton, did not forfeit the right to use his name in the toilet goods business to any greater extent than did John H. Woodbury when he granted the use of his name to the original Institute, the test of what should here take place may be found in the decision of The New York Court of Appeals in Andrew Jergens Co. v. John H. Woodbury, supra. The court, speaking of the contract of 1901, said: "It leaves the defendants entitled to use that name as applied to any other articles which they manufacture and sell *except such as so resemble the article specified in the contract* that they are calculated to deceive and mislead the public to believe that they are identical with those named in the contract." (Italics mine.) 197 N.Y. 66, at pages 67, 68, 90 N. E. 344.

The line of toilet goods put out by the present defendants is far from identical with that of William A. Woodbury Distributors, Inc.

The situation that has here developed may be said to have been anticipated by Judge Inch in his opinion in the case of Andrew Jergens Co. v. Bonded Products Corporation. He there stated (page 422) that a plaintiff should not be allowed "by force of expenditures of great sums of money, in an effort to emphasize the single word 'Woodbury,' * * * to enlarge its rights in this name beyond that allowed by the courts." In other words, the law should be exceedingly circumspect that it does not lend its aid in the oppression of small businesses by wealthy and powerful competitors.

While I am of opinion that plaintiff is entitled to relief which shall be comprehensive, it should not receive a restraining order of the plenary character that is sought. Although there is some reason to believe that William A. Woodbury, as was done in Hat Corporation of America v. D. L. Davis Corporation, D.C., 4 F.Supp. 613, and De Nobili Cigar Co. v. Nobile Cigar Co., 1 Cir., 56 F.2d 324, is lending his name to corporate structures in order that they may engage in unfair competition with the present plaintiff, I am disposed to acquit the defendants of a wholly fraudulent intention. Admission must be made that the formation of so many corporations bearing the name of William A. Woodbury, and none of which, with one or two exceptions, seems to have been of much substance, together with his receipt of stock holdings therein, in return for comparatively little affirmative assistance from him, are highly suspicious circumstances. At the same time, it is a fact which cannot be gainsaid that, in one way or another, William A. Woodbury has been connected with dermatological activities for upwards of thirty years. As a writer upon beauty culture, he has made some contribution to that subject matter, and of as good quality, I dare say, as the product of some others who essay to give advice in the way of improving the appearance of humankind. It is true, I have no doubt, that many persons who read his writings became purchasers of his products and gave him their good will. In the light of these facts, I see no reason why, if the companies bearing his name, together with the other defendants, be circumscribed in their activities so as to avoid practices of unfair competition, they should not be permitted to capitalize upon whatever prestige and good will have attached themselves to William A. Woodbury.

Defendants seek to defeat the issuance of even a qualified injunction on the ground that plaintiff's predecessors in interest, the John H. Woodbury Company of New York and the Woodbury Company of New York, were well aware that William A. Woodbury engaged in business after the Bonded Products decision, and that in 1927 the Laboratories, acting through Freedman, offered him a large sum of money for the rights to use his name, which offer was refused. This indicates the extremes to which Freedman and his company went at this time to buy all remaining rights in the surname. But what was done in these respects can hardly operate as an estoppel against the present plaintiff, except as to rights derived from the Laboratories in 1929. It is in no way inconsistent with the belief that William A. Woodbury could not use his name so as to deceive and mislead. In view of the fact that Woodbury was not a defendant in the Bonded Products Case, avoidance of further litigation which would be needed to secure a decree preventative of confusion binding upon him individually was desirable. Business prudence may thus have prompted an offer wholly disproportionate with the value of these rights as they appear today with a revelation of all the facts.

The length of this opinion has been necessitated, not so much by the complexity of the past transactions, as by a desire to formulate a clear standard of conduct whereby William A. Woodbury, and his privies or successors, both individual and corporate, should in the future be guided. It is no doubt unfortunate that here, no more than in the Bonded Products Case, a decree cannot be secured which will bind William A. Woodbury personally. If so, the fault is not with the court, but with plaintiff for having failed to join him. In so far as he is president of one defendant company and an officer of another, however, it is only in a technical sense that he is not party to this suit.

In addition to the two principal defendants herein, William A. Woodbury Corporation and William A. Woodbury Sales Co., Inc., I shall hold Dermay Perfumes, Inc., which sold part of the unfairly competing goods, and Regal Laboratories Inc., which manufactured them, liable as joint tort-feasors. Cf. Andrew Jergens Co. v. Bonded Products Corporation, supra, 21 F.2d 419, 424; Warner &

Co. v. Eli Lilly & Co., supra, 265 U.S. 526, 530, 44 S.Ct. 615, 617, 68 L.Ed. 1161. The remaining two defendants, Arkovy Cosmetic Corporation, by lack of service, and J. T. Robertson Company, Inc., through discontinuance, are not presently subject to the jurisdiction of this court.

In the drafting of the injunction, I have departed from the rather general provisions of the final Bonded Products decrees, which seem not to have completely served their purpose, and have been guided by a form recently used in this court. Cf. John B. Stetson Co. v. Stephen L. Stetson Co., D.C., 14 F.Supp. 74, 87, modified on points not here material, 2 Cir., 85 F.2d 586, certiorari denied 299 U.S. 605, 606, 57 S.Ct. 232, 81 L.Ed. 446.

My thought is that the rightful necessities of plaintiff will be cared for if defendants be restrained from selling or offering for sale, directly or indirectly, any and all toilet preparations on which "Woodbury" or "Woodbury's" appears as part of the title or name of the preparation on the label or packaging thereof; or from using on the label or packaging thereof the name "William A. Woodbury" or any abbreviated form thereof unless there be juxtaposed thereto, in clear and legible type, in letters of not less than *half* the dimension of those used in the said name, the following legend: "NOT CONNECTED WITH THE MAKERS OF 'WOODBURY'S FACIAL SOAP' AND OTHER TOILET PREPARATIONS SOLD UNDER THE NAME 'WOODBURY'S' OR 'WOODBURY.'"

The order shall also provide that defendants be restrained from selling or offering for sale, manufacturing, wrapping, packing or advertising, in any form whatsoever, any of their products or preparations, unless the said wrapping, packing, or advertising matter be accompanied by the following legend in clear, legible, and prominent type: "Not connected with John H. Woodbury, Inc., nor the former Jergens Company, Makers of 'Woodbury's Facial Soap' and other toilet preparations, sold under the name 'Woodbury's' or 'Woodbury.'"

The order shall further provide that defendants be restrained from authorizing, either actually or impliedly, any agents and salesmen from representing to any buyer, retailer, or consumer, that the goods manufactured, sold, or advertised by the defendants emanate from, or are in any way con-

nected with, plaintiff, John H. Woodbury, Inc., or the former Jergens Company, or the makers of "Woodbury's Facial Soap"; and from causing others in any way to make such oral or written representations.

It shall be ordered that either party may have the right to apply to the court at the foot of the decree, at any time after a period of six months from the date of the entry thereof, on proper notice and on such proof as the court may require, for a modification of the injunction contained in the decree if, in the course of its operation during the said period of six months, said provisions are shown to be unworkable. To effectuate this, a provision that the court will retain jurisdiction of the cause for said purpose will be inserted.

Defendants will be required to account for any profits which have accrued to them and which can be shown to have been directly and specifically attributable to the use of the name "Woodbury" or "Woodbury's" in connection with the manufacturing, selling, or advertising of defendants' toilet preparations.