**TRIANGLE PUBLICATIONS, Inc.**
v.
**CENTRAL PUB. CO., Inc.**

No. 8897.

United States District Court
W. D. Missouri.

Jan. 26, 1954.

Kemp, Koontz, Clagett & Norquist, Kansas City, Mo., Dilworth, Paxson, Kalish & Green, Philadelphia, Pa., for plaintiff.

C. Earl Hovey, Kansas City, Mo., for defendant.

REEVES, Chief Judge.

As usual in cases where immediate relief is sought, the emergent nature of the litigation compels hasty examination of facts and the law and quick (although not altogether unstudied) decisions.

In the beginning, acknowledgment should be made of the frankness and truthful revelations of the parties as to the facts in the case, and the diligence, as well as the learning of counsel on both sides, for their helpful presentation of the authorities upon facts scarely in controversy.

The controversy and resultant litigation involves activities in relation to a comparatively new enterprise—Television. This unusual accomplishment of scientists and artists has given the public the benefit of unprecedented opportunities for information and entertainment. With a modest localized beginning, television has extended and expanded until now it comprehends the entire world. In the trail of its quick and vast expansion new and useful enterprises have sprung up with a mushroomlike growth. This includes the announcements of coming programs and information relating to a new and rapidly expanding enterprise. Television is not area-bound and it is not subject to easy limitation or restriction. The most regulatory and supervisory authorities can do is to force avoidance of local channel conflicts.

This controversy arises from a business that originated early in the development of television and has endeavored to expand (in the wake of television development) a business that, in a way, accompanied the advance of television development, and it then sought to utilize the opportunities attending the development of television in Kansas City and its environs.

The plaintiff and its predecessors or constituents within the last two or three years in most eastern cities began the issuance of magazines designed to serve the public in connection with approaching or coming television displays or pro-

grams. As the number of television channels increased in the Midwest, it followed such increases and supplied its service and helpful magazines to the public. And for that purpose it expended large sums of money to promote and advertise its service magazines. By licenses, or franchises, or by its own efforts, it went into sundry communities, including the City of Chicago, and with increasing television channels in Kansas City it began its preparation to enter the Kansas City area. As a preliminary, in the year 1953, it caused its magazines prominently designated as TV Guide to be sold and distributed in the Kansas City area. Toward the end of that year it definitely planned and definitely arranged to open a place of business in Kansas City and to issue and distribute its localized magazine giving to the public advance television programs. In other words, its magazine, which enjoyed a large area circulation with localized television information elsewhere, planned to furnish to Kansas City and its environs helpful information to television viewers. The cover of its magazine displayed in prominent and conspicuous lettering or insignia "TV Guide."

On the other hand, the defendant (incorporated late in 1951) had been issuing in Kansas City a magazine which conspicuously advertised or displayed on its front cover the design or insignia "TV Preview." It furnished to the public locally substantially the same information the plaintiff had furnished elsewhere and which it was planning to supply in the Kansas City area with a cover magazine containing the letters and word "TV Guide."

That the plaintiff in the very nature and course of business would expand and did expand into Kansas City was anticipated by the defendant. Practically concurrently with the early development of plaintiff's business the defendant had contemplated the use of a similar name, that is to say, "TV Guide", for the front cover of its magazine. Its officers were dissuaded by a representative of local advertisers. This was done for the reason that, as it may be inferred from the evidence, both parties depend upon the income from advertising matter and good will of advertising patrons. In anticipation of the expansion of plaintiff into the Kansas City area, in September, 1953, the defendant, through its president, sent to the plaintiff its then-magazine containing on the front cover its identifying mark or insignia "TV Preview." And, on October 10th or 11th, following, the defendant sought a franchise from the plaintiff. This was in recognition of the expanding business of the plaintiff.

The president, or executive officer of the defendant, testified that he knew in October or November that the plaintiff definitely was expanding into the Kansas City area. Apparently he had anticipated this when writing an officer of the plaintiff on September 3, 1953, and sent a copy of the defendant's magazine. The defendant had not been successful in obtaining a franchise or securing a working arrangement with the plaintiff, and on December 2, 1953, he had a conversation with a wholesale distributor of magazines in the Kansas City area, and who was at that time handling plaintiff's publication. Previously to that, namely on November 24, 1953, this distributor had urged the defendant, or had suggested to the defendant, that it obtain a franchise from the plaintiff so that the defendant might handle plaintiff's magazine in the Kansas City area, and later he warned the defendant about the format it proposed to use.

On December 4, 1953, after the plaintiff had leased property and had made its definite arrangement to open offices in Kansas City, defendant issued its magazine containing conspicuously on its front cover the insignia or designation "TV Guide." This was done after it was known that the plaintiff had entered the Kansas City area.

At that time the plaintiff had a circulation throughout the United States and other countries aggregating 2,075,000 net paid. It had paid for promotion pur-

poses within a year a sum of money in excess of $465,000. The plaintiff first placed its magazines (with local information) on the newsstands on January 13, 1954, and within five days over 6,000 copies were sold.

This suit was filed on December 21, 1953, and a preliminary restraining order was issued without notice. Other facts, if they may become material or pertinent, will be stated in the course of this memorandum opinion.

Able counsel for both of the parties, upon the facts as above stated, are in practical agreement as to the law; counsel for plaintiff contending that, under the authorities, a temporary injunction should be issued, while able counsel for the defendant asserts otherwise.

The controversy does not involve an infringement of a trademark. It is not contended that such exists but the contention is that the defendant is unfairly competing with the plaintiff. The sole and only question is whether plaintiff had acquired a secondary meaning in the use of the descriptive words "TV Guide."

■ 1. In the case of Furniture Hospital v. Dorfman, 179 Mo.App. 302, 166 S.W. 861, loc.cit. 863, the Supreme Court of Missouri made the accurate and sound pronouncement:

"But even descriptive terms may by long use become identified in the minds of the public with the business of a particular trader, and in such case it is unfair competition for a subsequent trader to use them in such manner as to pass off his business for that of the other."

This is so for the reason that apparently there is no contention but that the terms or designation of plaintiff's magazine are descriptive terms. (Incidently, it is the writer's view that the original designation of defendant's magazine "TV Preview" was more accurately descriptive than "TV Guide.")

■ 2. The plaintiff relies upon the rule that a trade-name, as in this case, may acquire a secondary meaning. This is a familiar doctrine. A secondary meaning identifies the product with the proprietor in the minds of the public.

■ In Schwartz v. Television Center, 89 U.S.App.D.C. 30, 189 F.2d 691, 692, the Court of Appeals for the District of Columbia set forth an acceptable rule in a quotation from a prior decision, as follows:

" 'To constitute unfair competition in respect to a trade name, two elements must be present. · The name must have acquired a secondary meaning or significance that identifies the plaintiff; the defendant must have unfairly used the name or a simulation of it against the plaintiff.' "

Later, in the same opinion, the court said:

"The general rule is that descriptive words are not capable of exclusive appropriation as trade names. * * *, the rule of law applicable to trade names has recognized that some words or phrases although descriptive are capable of appropriation by the first user. This exception has never been applied however, when the forms of the advertisements varied so as not to present a lasting impression in the minds of the public".

And, later, the court quoted from a text, as follows:

" 'Secondary meaning is *association*, nothing more. It exists only in the minds of those of the public who have seen or known or have heard of a brand of goods by some name or sign and have associated the two in their minds.' "

The testimony of Mr. Smay and Mr. Davis justifies the conclusion that the name employed by the plaintiff was associated in the minds of the public with the plaintiff, so· that the plaintiff and its magazine and the insignia mentioned were all associated in the minds of the public as one.

The district court for the E. D. of Arkansas, Beneficial Loan Corp. v. Personal Loan & Finance Corp., 100 F. Supp. 838, loc.cit. 848, considered a somewhat similar state of facts in accepting the above rule, as follows:

"The fact that a trade mark or trade name may have acquired a secondary meaning in one locality does not mean that it has acquired such meaning in an entirely different trade area *where the public is unfamiliar with such name or mark.*" (Emphasis mine.)

It should be stated here that, as announced above, the public, through advance information and otherwise of plaintiff's magazine, had become familiar with the name employed by the plaintiff.

The Eighth Circuit Court of Appeals, in Griesedieck Western Brewery Co. v. Peoples Brewing Co., 149 F.2d 1019, loc.cit. 1022, announced familiar doctrine as follows:

"But the trade-mark, not being created by registration, is inseparable from the good will of the business of its possessor. * * * The right to the exclusive use of a trademark or trade-name is limited to the territory or market wherein it has become established by use in such territory. * * * *It is only where the trade goes attended by the use of the mark that the right of the owner of the trade-mark is protected as against the sale by others of their product similarly labeled. A trade-mark can not be divorced from the good will of its owner, and it confers no right in the abstract.*" (Emphasis mine.)

And the District Court for the District of Rhode Island, Navy Club of United States v. All-Navy Club, 85 F.Supp. 679, loc.cit. 682, set forth the rule:

"It is clear that the first user of such a name will be protected against a second user if the name has acquired a 'secondary meaning', that is, if the name has come to be identified in the mind of the public with the products or services sold by the first user, then a second user will be enjoined from an unfair use of the same or a confusingly similar name."

In like manner, the District Court for the N. D. of California in Morse-Starrett Products Co. v. Steccone, 86 F.Supp. 796, loc.cit. 804, said:

"In short plaintiff has built up a secondary meaning which is entitled to protection."

3. On the question of an expanding business, the Eighth Circuit Court of Appeals in Katz Drug Co. v. Katz, 188 F.2d 696, loc.cit. 698, said:

"'* * * the concept of a market area into which a given business may normally expand is difficult at best'".

This was a quotation of the court and was preliminary to a holding that the business of the plaintiff in that case had not expanded into an area where it sought protection.

The case of Sweet Sixteen Co. v. Sweet '16' Shop, 15 F.2d 920, loc.cit. 923, is one in which the Circuit Court of Appeals for the Eighth Circuit, recognized the rights of an expanding business when in substance it said that protection would not be extended in territories into which the plaintiff had not expanded.

And, in construing a Massachusetts statute, the Court of Appeals for the First Circuit in Food Fair Stores v. Food Fair, 177 F.2d 177, loc.cit. 183, announced a doctrine clearly applicable in the case at bar:

Plaintiff had a right to regard Massachusetts as the 'territory from which he * * * with the probable expansion of his business may reasonably expect to receive custom * * * .' * * * The right to protection in territories where one 'receives or with the probable expansion of his business may reasonably expect to receive custom' * * * is protected * * * from dilution."

This protection, of course, was expressly provided by a Massachusetts statute.

■ The rule announced by the Supreme Court of the United States in Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, loc.cit. 415 and 419, 36 S.Ct. 357, 361, 60 L.Ed. 713, followed the common law:

"But where two parties independently are employing the same mark upon goods of the same class, but in separate markets wholly remote the one from the other, the question of prior appropriation is legally insignificant; unless, at least, it appear that the second adopter has selected the mark with some design inimical to the interests of the first user, such as to take the benefit of the reputation of his goods, to forestall the extension of his trade, or the like."

This reference to an effort to forestall the extension of trade apparently is the universal rule, including the common-law rule in relation to unfair competition.

■ As was said in the case of Brown & Bigelow v. B. B Pen Co., 8 Cir., 191 F.2d 939, loc.cit. 942:

"It is universally held that the law of trade-marks and trade-mark infringement is but a part of the law of unfair competition."

And under all of the authorities a person or a corporation " * * * has a legitimate interest in seeking to protect its goodwill and the reputation of its mark". Sunbeam Furniture Corp. v. Sunbeam Corp., 9 Cir., 191 F.2d 141, loc.cit. 144.

In the case of Miles Shoes, Inc. v. R. H. Macy & Co., Inc., 2 Cir., 199 F.2d 602, 603, the revered Augustus N. Hand made but negative reference to the rule in respect of rights attending an expanding trade-name. He said:

"Such a use does not affect the uniqueness of Macy's mark in a different area, *which Hahn had never chosen to enter.*" (Emphasis mine.)

Judge Hand cited the case of Hanover Star Milling Co. v. Metcalf, supra.

In United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, loc.cit. 103, 39 S. Ct. 48, 63 L.Ed. 141, the court, in citing the Hanover Star Milling Co. case, again intimated the right to protect a trademark or trade-name where the territory of the holder's operation was not limited.

It is unnecessary to multiply authorities. Quite clearly the defendant was advised and understood that the plaintiff was extending its operations into the Kansas City area. In fact, plaintiff's magazine had already been introduced in Kansas City and its area and the defendant was apprised of that fact. It knew, moreover, not only of the expanding business of the plaintiff, but that it was on the moment of extending its operations into Kansas City, and after it had actually established headquarters in Kansas City, the defendant, for the first time, issued a magazine clearly imitative of the name and mark used by the plaintiff on the cover of its magazines. The defendant abandoned an equally descriptive and significant mark, "TV Preview" and adopted that of the plaintiff.

■ Under all of the authorities this was unfair competition even though the plaintiff had not fully entered the area. The defendant cannot complain, as it did to Mr. Smay, that the plaintiff was large and financially strong and was endeavoring to destroy or throttle competition. The evidence does not justify that inference. The defendant is at liberty to continue to publish and issue its magazine precisely as it did prior to December 4, 1953.

It follows that the plaintiff is entitled to a temporary injunction, and counsel for plaintiff will prepare and submit an appropriate decree. In like manner, counsel on both sides will submit such request for findings of fact and declarations of law as they may believe proper.