**HUBER BAKING COMPANY, Plaintiff-Appellant,**

v.

**STROEHMANN BROTHERS COMPANY and Quality Bakers of America Cooperative, Inc., Defendants-Appellees.**

**No. 37, Docket 24466.**

United States Court of Appeals
Second Circuit.

Argued Oct. 15, 16, 1957.

Decided Feb. 24, 1958.

Appell, Austin & Gay, New York City (Cyrus Austin, Rogers, Hoge & Hills and Lenore B. Stoughton, New York City, of counsel), for plaintiff-appellant.

Nims, Martin, Halliday, Whitman & Williamson, New York City (John Dashiell Myers and Henry Temin, Philadelphia, Pa., and Carl B. Shelley, Harrisburg, Pa., of counsel), for defendant-appellee Stroehmann Bros. Co.

Greenwald, Kovner & Goldsmith, New York City (Harold Greenwald and Harry Litwin, New York City, of counsel), for defendant-appellee Quality Bakers of America Co-op., Inc.

Before MEDINA, HINCKS and WATERMAN, Circuit Judges.

MEDINA, Circuit Judge.

This is an appeal from the trial court's dismissal of plaintiff Huber Baking Company's complaint. Huber sought an injunction against defendant Stroehmann Brothers Company's alleged trademark infringement and unfair competition, and against the licensing of certain trademarks by Quality Bakers of America Cooperative, Inc. for use in an area allegedly reserved for Huber's exclusive use. Huber also sought an accounting and damages.

The facts, none of which are in serious dispute, are as follows:

QBA, the successor of a similar association founded in 1924, is a non-profit cooperative organized under the laws of New York to help promote the business of its baker-members located throughout the United States. QBA itself does not bake, sell or distribute any baked goods, but it does gather information, furnish advice, and to some extent supervise the baking, sale and local distribution of the products of its members. In connection with its merchandising services QBA, during the 1920's and 1930's had attempted to promote a cohesive marketing program involving the use by its several members of a common wrapper design, with minor variations in the design as each member desired. The advantages of such a program were twofold: the pooling of members' advertising budgets made possible the economies inherent in the mass purchasing and printing of materials; and the establishment of a "national brand" of bread, resulting from the local advertising of individual members and the use of radio, billboards and magazines throughout the United States, would inure to the benefit of each member. Prior to 1940 four different wrappers had been designed by QBA and

used by its members, but without any marked success. In 1938 QBA began research to design still another wrapper. It was decided that the picture of a child would possess the characteristics necessary for a sufficiently distinctive and attractive mark, and the designing efforts thereafter were centered mainly on the selection of an appropriate picture or drawing.

In 1941, while the preparatory work for the new trademark was still in progress, QBA's advertising manager communicated with Huber's president with a view to inducing Huber to join QBA. At this time, and at all times since, Huber, a Delaware corporation founded in 1913, baked and marketed various types of bread and rolls and had its only factory in Wilmington, Delaware. Huber distributed its baked goods throughout Delaware and in parts of Maryland, New Jersey and Pennsylvania.

In 1913 Huber had begun using the words "Sun Beam," printed on a small label against a background of black and yellow squares, as a mark on some of its bread. The label as a whole was registered in the United States Patent Office in 1913, but was used for only a few years. Thereafter, however, Huber continuously sold at least one of its types or varieties of loaves of bread with the mark "Huber's Sunbeam Bread" until 1942, while during this same period, on its several other loaves, it repeatedly experimented with different names and marks, none of which proved to be so successful as to warrant its use continuously. Since the Huber management felt their advertising expenditures were not being used to maximum advantage because of the failure to concentrate on a single brand name with an accompanying mark, they were considerably interested in the advertising program being developed by QBA when the QBA officers invited them to join the cooperative.

Numerous meetings and conversations ensued, with the result that Huber agreed to join QBA and use the mark which was ultimately developed by QBA. This consisted essentially of a picture of

a young girl with golden curls eating a slice of bread. In the course of the discussions, Huber's president had suggested that the name "Sunbeam" be used in addition to the picture and QBA accepted this suggestion. As the promotion campaign developed the little girl was eventually called "Miss Sunbeam," and the bread was advertised nationally as "Sunbeam Bread" with both "Sunbeam" and the girl's picture appearing on every bread wrapper. On the local level each QBA member put his own name on the wrapper in addition to the Sunbeam name and mark; thus Huber's labels and wrappers read "Huber's Sunbeam Bread."

On November 6, 1941 Huber signed a probationary membership agreement with QBA, and on September 14, 1942 "broke" the "Sunbeam campaign" by using the Sunbeam name and mark as described above on all of its bread and rolls. Shortly after Huber's "breaking" this campaign QBA licensed its other members, at the time of trial numbering approximately 100, to use the material in specific areas. These licenses essentially provided that: the member licensee had "a non-assignable and non-exclusive right to employ the trademark and tradename entitled 'Sunbeam,' * * * within the limits * * * of the trading area hereinafter specified"; the Sunbeam trademark used by the member was not to be altered "in any manner, whatever, except with the consent of (QBA)"; all material used by the member which related to the Sunbeam advertising was to be purchased from QBA "exclusively"; all rights to the use of the Sunbeam material would terminate upon the licensee's ceasing to be a member of QBA; the member warranted that, at the time of the licensing, he actually served the entire area in which he was licensed to use the Sunbeam material, and the failure to distribute throughout this entire area would operate as a waiver of the member's Sunbeam rights in the portion not served.

On April 27, 1943, QBA registered the picture of the little girl as a collective trademark in the United States Patent Office, and during 1946 and 1947 also registered a composite of the picture and the word "Sunbeam" in 46 states, including every state in which Huber does business. As further protection for the benefit of all its members, QBA, in 1948, formed corporations under the name "Sunbeam Bakers, Inc." in most of the states of the United States, and in addition, beginning in 1942 QBA obtained copyright registration for several of its wrappers and labels as a whole and for its advertising material.

From a time shortly before Huber began using the "Sunbeam campaign" until the date of trial, Huber had made full use of the services and facilities which QBA offered member-bakers. Thus Huber periodically submitted sample loaves of its bread to the QBA laboratory to be checked and "scored" against the loaves of other members; it sent periodic sales records to the QBA offices; QBA sanitarians regularly inspected the Huber bakery and helped it maintain certain minimum sanitary conditions; and Huber had the mills from which it bought flour submit samples to the QBA laboratory so that its technicians might check whether the grade of flour was what it was represented to be, and also to inform Huber of the baking method that would achieve the best results with the flour in each shipment.

Prior to December 26, 1944, however, Huber and QBA had not entered into a formal written agreement specifying Huber's rights to the use of the Sunbeam campaign. Huber wanted an exclusive right, assignable to any purchaser of its business, to sell Sunbeam bread and rolls within an area over and beyond that which it was then serving, and it was willing to assign to QBA all its rights to the word "Sunbeam" outside of this area. In April, 1944, QBA submitted the standard form Sunbeam license to Huber, which Huber would not sign because it was therein provided that Huber's rights to the Sunbeam material were "non-assignable and non-exclusive." QBA attorneys thereafter drafted sever-

al other contracts, along with a form for the assignment by Huber to QBA, before producing one which met with Huber's approval. Both the contract and assignment, prepared by QBA counsel, were signed by Huber on December 26, 1944.

The assignment, although containing the recital that it was an agreement entered into between Huber and QBA, was signed only by Huber and provided that for a valuable consideration Huber did "sell, assign, transfer and set over unto Quality Bakers of America Cooperative, Inc., the entire right, title and interest in and to the label" entitled "Huber's Sunbeam Bread" and "each and every part thereof, * * * reserving unto itself, however, the full and unrestricted right to the use of the same within the limits of the trading area hereinafter specified: The entire State of Delaware, together with such portions of the States of Maryland, Pennsylvania and New Jersey" as were indicated on an attached map, "including the City of Philadelphia, * * * even though some of the said territory is not at present served by the Huber Baking Company."

The contract, signed by both Huber and QBA, differed from the standard form of license already in use by QBA with its other members for approximately two years in the following respects: Huber was given "the right to assign the use of said work of art, trade-mark, label and package, 'Sunbeam' campaign, and all and each of the same to any organization which may purchase the Huber Baking Company outright and continue its operations in the trading area designated"; Huber had to buy all of its Sunbeam advertising material from QBA, "unless it is to the Huber advantage to purchase otherwise"; the statement limiting Huber's "Sunbeam" trading area was identical with the area within which Huber reserved rights in the assignment previously described, although Huber was not then serving that entire area; Huber was given the right to alter the "Sunbeam" mark without the consent of QBA "at such time as Huber may cease to be a member of (QBA)"; Huber was

given "the right to the use of said work of art, trade-mark, label and package, 'Sunbeam' campaign, and all and each of the same within the limits of the trading area hereinafter specified."

Defendant Stroehmann Brothers Company, a baking company incorporated in Pennsylvania, had for several years prior to 1942 been a competitor of Huber in Philadelphia. Stroehmann for many years had been a member of QBA, but, both before and after the launching of QBA's "Sunbeam campaign," it sold bread in Philadelphia under marks other than "Sunbeam." In January, 1944, however, eleven months before Huber's written agreement with QBA, Stroehmann sought QBA's permission to use the little girl alone as a mark on some of its bread to be sold in Philadelphia. At Huber's objection, QBA denied Stroehmann's request. Thereafter, until December 12, 1951, Stroehmann repeatedly sought to have its Sunbeam license extended to include Philadelphia, but in each case Huber's objection prevailed. On this latter date, however, the license was extended to Philadelphia after Stroehmann entered into an indemnity agreement for an unlimited amount with QBA to pay all claims against QBA arising out of this extension of the license, but Stroehmann was not authorized to attempt to sell to any Philadelphia merchant who was then buying Sunbeam bread from Huber. QBA granted the extension because, in its view, Huber's license to sell Sunbeam bread within its specified territory was not exclusive, and also because it was in the best interests of QBA and its members to have greater sales of Sunbeam bread in Philadelphia, Huber's penetration of the Philadelphia market having been limited.

Early in 1952 Stroehmann began selling bread in Philadelphia with the Sunbeam wrapper; the labels differed from those used by Huber only in that "Stroehmann's" appeared over the words "Sunbeam Bread" instead of "Huber's." Shortly thereafter, in May, 1952, Huber filed a complaint in the District Court charging Stroehmann with trademark in-

fringement in using "Sunbeam" and the picture of the little girl, and unfair competition through the use of confusingly similar wrappers and labels in Huber's territory. QBA was charged with contributory infringement and unfair competition because it had licensed Stroehmann to use the Sunbeam marks in Philadelphia and had supplied the wrappers and other materials for such use. Jurisdiction below was based on diversity of citizenship and the requisite amount in controversy, and after a trial in June, 1956, the District Court dismissed Huber's complaint, holding that the QBA license to Huber was non-exclusive.

We note, at the outset, that there is no question as to the similarity of the Sunbeam wrappers and labels used by Stroehmann and Huber in Philadelphia. That such similarity would cause confusion in the minds of customers is not disputed.

Huber, however, claims that it has the exclusive right to use this Sunbeam material, arguing, first, that it owned the mark "Sunbeam" through continuous use prior to joining QBA, that nothing it has done while a member of QBA has diminished or impaired this ownership, that the picture of the little girl and other embellishments developed by QBA have become part of one indivisible "Sunbeam" mark, and that Huber thus owns the right to use the Sunbeam material within the territory specified in the contract with QBA and the assignment. As a second argument, Huber urges that a proper construction and interpretation of the contract and assignment, both executed on the same day, show that QBA contracted to give Huber the exclusive right to use the Sunbeam material within the territory specified therein.

QBA and Stroehmann, on the other hand, contend that, since QBA created the picture of the little girl and registered this as a collective trademark, it continuously maintained control over all of its licensees, and, the girl's picture and the word "Sunbeam" having become inseparably connected, QBA owns the entire "Sunbeam" campaign, and that the license it granted Huber was non-exclusive in the absence of a specific provision that it was exclusive. In addition, they claim that Huber is estopped to claim an exclusive license because it acquiesced in QBA's advertising campaigns and submitted to control by QBA.

A basic claim by QBA and Stroehmann, which prevailed below, is that the contract shows on its face that it is a license agreement and that it is settled law that, in the absence of a clause specifically stating that the license is exclusive, it will be conclusively presumed to be non-exclusive. QBA and Stroehmann insist that this disposes of the case, and that the prior dealings and relationship of the parties and the signing by Huber of the assignment of the mark Sunbeam on the same date upon which the agreement was signed are without significance or effect.

Before we examine those cases principally relied on by QBA and Stroehmann, however, we must first consider the choice of law problems presented by the facts of this case. Jurisdiction in the court below was based on diversity of citizenship, and, therefore, it would seem that in view of the decisions of the United States Supreme Court in Erie R. Co. v. Tompkins[1] and Klaxon Co. v. Stentor Electric Mfg. Co.[2] one should turn to the whole law of New York, as a New York court would do, to determine the controlling rules of decision for the case at bar.[3] But it has also been suggested, and indeed on sound reason, that it is the source of the right sued on rather than the basis of federal jurisdiction which determines the law governing a particular case.[4]

1. 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

2. 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477.

3. Compare Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99, 50 A.L.R.2d 246, with New Amsterdam Casualty Co. v. Stecker, 3 N.Y.2d 1, 163 N.Y.S.2d 626.

4. Maternally Yours, Inc., v. Your Maternity Shop, Inc., 2 Cir., 234 F.2d 538, 539, 540 note 1; Hart & Wechsler,

■ Bearing this principle in mind we turn now to another aspect of the case at bar. Although the parties to this action recognized that diversity afforded one basis for jurisdiction in the District Court, jurisdiction also existed under the Lanham Act[5] since the controversy involves a mark registered pursuant thereto. In this case, moreover, not only was the composite mark used in the "Sunbeam campaign" registered under the Lanham Act[6] but, since a collective mark was unknown to the common law,[7] it is actually a creature of federal statute. That the common law did not recognize such a mark is apparent from the nature of the mark itself. A collective mark is owned, and may be registered, by the group or association of which it is a symbol,[8] but not by a user thereof, and it indicates to the public that members of the association produced the merchandise bearing the mark. The association which owns the mark may not use it on merchandise, if it produces any, as may its members.[9] Since the common law required affixation[10] and user[11] for the acquisition of a trademark it is clear that there would be no basis in that law for a collective mark, and indeed such marks were denied registration under the Trade-Mark Act of 1905.[12] However, a

1938 amendment[13] to the Act of 1905 provided for the registration of collective marks[14] and the Lanham Act included a similar provision.[15]

■ In view of the principle that the source of the right sued on is determinative of the controlling law, and since a federal statute provides the essential basis for all rights in the collective mark "Sunbeam" as developed by QBA and used by its members we see no alternative other than to regard the questions necessarily involved in the use of a collective mark as within the ambit of federal law.[16] The desirability of applying a uniform federal law in this area is manifest. For example, questions of the degree of control over members required for the validity of a collective mark under 15 U.S.C.A. Section 1054 are federal questions, involving as they do the interpretation and application of a federal statute, and indeed uniformity of decision on such a question is necessary as a guide to the determination by the Patent Office of what marks are to be registered. It is inconceivable that, in cases involving these questions, the law of individual states with regard to the control necessary for the valid licensing of an ordinary trademark[17] is to be applied by the

The Federal Courts and the Federal System (1953) 697.

5. 15 U.S.C.A. Section 1121; Maternally Yours, Inc., v. Your Maternity Shop, Inc., footnote 4, supra.

6. 15 U.S.C.A. Section 1051 et seq.

7. Nims, The Law of Unfair Competition and Trade-Marks (1947) 130.

8. 15 U.S.C.A. Section 1054.

9. Callmann, The Law of Unfair Competition and Trade-Marks (1950) 1040.

10. E. g., Phillips v. Hudnut, 49 App.D.C. 247, 263 F. 643.

11. E. g., Western Stove Co. v. Geo. D. Roper Corp., D.C.S.D.Cal., 82 F.Supp. 206.

12. Act of Feb. 20, 1905, c. 592, 33 Stat. 724; Ex parte Foreningen Sveriges Spisbrodstabrikanter, 1930, 6 U.S.P.Q. 27.

13. Act of June 10, 1938, c. 332, § 1, 52 Stat. 638.

14. See Ex parte International Union United Automobile Workers of America, 1942, 54 U.S.P.Q. 52.

15. 15 U.S.C.A. Section 1054.

16. See Brown & Bigelow v. Remembrance Advertising Products, Inc., 279 App.Div. 410, 110 N.Y.S.2d 441, affirmed 304 N.Y. 909, 110 N.E.2d 736, where the court stated, without citation of authority, that in a suit for trade-mark infringement "all questions as to validity and infringement of trade-marks registered under the United States statutes are to be determined by Federal statutory and decisional law." 279 App.Div. at page 412, 110 N.Y.S.2d at page 444; see also Developments in the Law—Trade-Marks and Unfair Competition, 68 Harv.L.Rev. 814, 876–77 (1955).

17. See, e. g., E. F. Prichard Co. v. Consumers Brewing Co., 6 Cir., 136 F.2d 512, 519; Keebler Weyl Baking Co. v. J. S. Ivins' Son, D.C.E.D.Pa., 7 F.Supp. 211, 214.

federal courts when such rules may lead to widely varying results. Likewise, although a contract or license may be thought of as existing under the common law as applied by the several states, where, as in the case at bar and as is likely with many similar associations, an organization using a collective mark has licensed members throughout the United States, a uniform interpretation of those licenses is desirable. Clearly, such a result is best achieved by the application of federal law,[18] although the precise rules of decision in many areas of the law have not yet been formulated. Moreover, a contract or license between an association registering a collective mark and its members is absolutely essential to the existence and use of the collective mark, while this is not true of an ordinary trademark.

But regardless of whether federal or state law is controlling in the case at bar, we do not think the case law on the subject supports the arbitrary rule of interpretation for which QBA and Stroehmann contend, as above stated, and we conclude that the agreement is governed by the same rules as are applicable to the interpretation of contracts generally. We turn to a consideration of the decisions relied upon by QBA and Stroehmann.

In Overman Cushion Tire Co. v. Goodyear Tire & Rubber Co., 2 Cir., 59 F.2d 998, certiorari denied 290 U.S. 681, 54 S.Ct. 119, 78 L.Ed. 587, this Court held that the petitioner-licensee did not have the right to participate in the damages recovered by its licensor against a patent infringer since it did not have an exclusive license. There, however, the license was held to be non-exclusive because the patentee expressly reserved the right to grant another license to one of several other parties. And in Western Electric Co. v. Pacent Reproducer Corp., 2 Cir., 42 F.2d 116, another case involving the rights of a licensee to join its licensor in suing a patent infringer, this Court held that "an obligation that the grantor will not thereafter grant any similar license is * * * clearly to be implied" from the grant of "all the rights which (the grantor) now has or may hereafter have (under the patents) to exclude others" from using the patented devices, 42 F.2d at page 119, and rejected the patentee's argument that it had transferred only its remedies against infringers without granting the equivalent of a license. There is nothing in these cases to indicate that ordinary rules regarding the interpretation of contracts are to be ignored when the agreement is called a "license."

QBA and Stroehmann also rely on three decisions from other jurisdictions in support of their contention that Huber's license was non-exclusive. These decisions are readily distinguishable from the case at bar, they are not persuasive when applied to the fact situation now before us, and, in addition, it is not clear that they formulate a rule of state law even if state law be applicable to the Huber license.

Two of the cases involve the interpretation of contracts establishing sales agencies. In Dahath Electric Co. v. Suburban Electric Development Co., 332 Pa. 129, 2 A.2d 765, the contract in question made the plaintiff the selling agent within a specified territory for goods which the defendant distributed, and also contained the usual integration clause stating that the contract contained the entire agreement between the parties. There was no provision regarding the exclusivity of the plaintiff's agency, but, when the defendant authorized a third party to sell goods in the same area as that specified in the plaintiff's contract, the plaintiff sued to compel the defendant to pay the commissions which would have been due the plaintiff had it made the sales which were made by the third party. The theory on which the plaintiff sought to recover the commissions was that it had an exclusive sales agency in the designated area, but the court held that the contract provided for a non-

---

18. Cf. concurring opinion of Chief Judge Clark, Maternally Yours, Inc., v. Your Maternity Shop, Inc., 2 Cir., 234 F.2d 538, 545.

exclusive agency, reasoning that the contract was not ambiguous since, if the parties had intended to create an exclusive agency, the writing would have specifically contained such a provision. J. I. Case Threshing Mach. Co. v. Wright Hardware Co., 61 Tex.Civ.App. 481, 130 S.W. 729, is another case involving similar facts and in which the court reached the same result as in Dahath.

And in Hart v. Cort, 165 App.Div. 583, 151 N.Y.S. 4, the court held, in a three to two decision, that evidence of custom in the theatrical trade was not admissible to show that a contract licensing the defendant to present a certain play, and naming the leading actress who was to appear in every performance, was an exclusive license. The majority opinion discussed at length the rule regarding the admission of evidence of custom to aid in the interpretation of a contract and decided that it was not admissible in the case before it because such evidence would have had the effect of adding another term to the contract. The dissent, on the other hand, viewed the contract as ambiguous and considered the evidence regarding custom as an explanation of the phrase in the contract giving defendant "the right to represent the play." 165 App.Div. at page 589, 151 N.Y.S. at page 8.

Another difficulty with the statement of law in these Pennsylvania and New York cases as applied to the facts of the case at bar, is that there are other cases in those states the rules of which, when applied to the Huber license, would lead to a contrary result. Thus in Home Builders of Mercer County, Inc., v. Dellwood Corp., 379 Pa. 255, 108 A.2d 731, the court, after stating the rule of the Dahath case, also notes that any doubt in the interpretation of a contract is to be resolved against the party who drew it. In the Dellwood case that rule led to the same result as did application of the Dahath rule, but in the case now under consideration it leads to the opposite result. Likewise, in Deveso v. Chandler, 210 App.Div. 684, 206 N.Y.S. 604, the court distinguished Hart v. Cort, supra,

and said that evidence of custom is admissible when it "would merely * * * (add) a provision covering a point upon which the contract was silent." 210 App. Div. at page 689, 206 N.Y.S. at page 607. Application of this rule stated in Deveso would also show that the contract here read alone, does not provide for a nonexclusive license, but rather is ambiguous.

■ And, as stated above, we are not persuaded by these cases and therefore cannot accept, as a rule of law, the argument of appellees that a license without provision as to exclusivity is necessarily and under any and all circumstances nonexclusive. The license in the case at bar did not contain an integration clause as did the agreement in Dahath and there is considerable evidence, in addition to the course of dealings between the parties and the circumstances under which Stroehmann finally induced QBA to permit it to enter the Huber territory, such as the terms of the assignment regarding Huber's "full and unrestricted right" in the specified territory and the specific provision in all of QBA's licenses with its other members that the licenses were non-exclusive, to support Huber's position that its contract with QBA actually provided for an exclusive license. Nevertheless, the agreement itself, when read alone and not in conjunction with the assignment simultaneously executed, is still, in our opinion, ambiguous with regard to the exclusivity of Huber's rights.

■ Since the contract is ambiguous on its face we must look at the circumstances surrounding its formulation in aid of interpreting the agreement. Nevertheless, Huber's contention that the contract and assignment should be read together might, at first, seem anomalous in that it urges construction of a bilateral agreement in the light of a unilateral assignment. Thus by means of the assignment, which purports to transfer rights to QBA, Huber is seeking to influence the interpretation of the contract. But this assignment was not a mere gratuity, given as a self-serving document by Huber. It was something which, as the

minutes of QBA's directors' meeting state, QBA wanted in exchange for the unusual rights to the use of the Sunbeam campaign it granted Huber in the contract. And in allowing Huber to reserve "full and unrestricted" rights in the specified territory, the assignment is indicative of the intention of the parties at the time of executing the instruments.

We conclude that the contract and the assignment should be read together, and that both instruments should be read in the light of the exclusive right which Huber, prior to its assignment to QBA, had to the mark "Sunbeam" in the reserved territory, and against the circumstantial background to which reference has been made. We hold that under the contract so construed it is reasonably plain that Huber was intended to have the exclusive use to the Sunbeam campaign in the designated territory.

At this point it is well to consider some general principles of trademark law. Trademark rights are acquired by use, or appropriation, Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713; United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141; Jacobs v. Iodent Chemical Co., 3 Cir., 41 F.2d 637, and registration alone of the trademark does not increase the scope of such substantive rights. The area throughout which rights thus acquired by use will be protected, however, has not been clearly defined by the cases. Under modern conditions, with vastly increased means of communication and the use of advertising media of a far-reaching character, many recent cases have afforded the holder of a trademark protection throughout a greatly extended area when the holder's business reputation and prestige are widespread, provided always that the rights of the public are fully protected. Stork Restaurant v. Sahati, 9 Cir., 166 F.2d 348; Ambassador East, Inc., v. Shelton, D.C.S.D.N.Y., 120 F. Supp. 551; Brass Rail, Inc., v. Ye Brass Rail of Massachusetts, Inc., D.C.D.Mass., 43 F.Supp. 671; Maison Prunier v. Prunier's Restaurant & Cafe, Inc., 159 Misc. 551, 288 N.Y.S. 529. However, in those cases where, as in the case at bar with regard to Huber's "Sunbeam" mark prior to 1942, there was no evidence of nation-wide advertising or reputation courts have held the trademark rights limited to those states throughout which the holder's goods have been sold to the public, Hanover Star Milling Co. v. Metcalf, supra; United Drug Co. v. Theodore Rectanus Co., supra; see also, American Chicle Co. v. Topps Chewing Gum, Inc., 2 Cir., 210 F.2d 680, 682; Miles Shoes, Inc., v. R. H. Macy & Co., 2 Cir., 199 F.2d 602, 603, certiorari denied 345 U.S. 909, 73 S.Ct. 650, 97 L.Ed. 1345, or the holder's salesmen have traveled. Youthform Co. v. R. H. Macy & Co., D.C.N.D.Ga., 153 F.Supp. 87.[19] Thus, the rights to a trademark extend throughout the entire territory actually served by the owner, or covered by his advertising, and also, it would seem, at least to an area which would provide room for probable or anticipated expansion. See Hanover Star Milling Co. v. Metcalf, 240 U.S. at page 415, 36 S.Ct. at page 361; Food Fair Stores, Inc., v. Food Fair Stores, 1 Cir., 177 F.2d 177; Triangle Publications, Inc., v. Central Pub. Co., D.C.W.D.Mo. 117 F.Supp. 824. In view of these principles, Huber, prior to its use of QBA's "Sunbeam campaign," probably had the right to "Sunbeam" as a trademark throughout the entire area in which it expressly reserved full and unrestricted rights in the as-

19. Where a prior appropriator of a trademark on toothpaste confined his sales to one city while, with his knowledge, a junior user of the mark expanded his business throughout most of the state in which this city was located, the court limited the prior appropriator's right to the city in which he sold the toothpaste, Jacobs v. Iodent Chemical Co., supra, and a District Court opinion has interpreted the Jacobs case as limiting the trademark rights to the field actually occupied. Keebler Weyl Baking Co. v. J. S. Irvins' Son, Inc., D.C.E.D.Pa., 7 F. Supp. 211; see also Food Fair Stores, Inc., v. Square Deal Market Co., 93 U.S. App.D.C. 7, 206 F.2d 482.

signment which it gave QBA. Although Huber sold few, if any, of its products in Camden, New Jersey, and its sales in Philadelphia were largely confined to the southwest portion of that city, Huber did serve more than 1150 Philadelphia grocers and it is fair to assume that the Huber "Sunbeam" was widely known in that area.[20]   And that Huber was not able to produce any evidence of having sold its "Sunbeam" bread in Philadelphia in the interval between 1939 and the "breaking" of the Sunbeam campaign by Huber on September 14, 1942 is of little significance since the mere non-use for such a short period of time would not constitute abandonment in the absence of an intent to abandon the trademark. Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 419, 36 S.Ct. 357, 60 L.Ed. 713; Dupont Cellophane Co. v. Waxed Products Co., 2 Cir., 85 F.2d 75, 76–77, certiorari denied E. I. Du Pont De Nemours & Co. v. Waxed Products Co., 299 U.S. 601, 57 S.Ct. 194, 81 L.Ed. 443; Wallace & Co. v. Repetti, Inc., 2 Cir., 266 F. 307, 308, certiorari denied 254 U.S. 639, 41 S.Ct. 13, 65 L.Ed. 451; Anheuser-Busch, Inc. v. Budweiser Malt Products Corp., D.C.S.D.N.Y., 287 F. 243, 245–246, affirmed, 2 Cir., 295 F. 306. But, regardless of the geographical extent of Huber's trademark rights prior to its breaking of the Sunbeam campaign, and while, of course, Huber could not, by the mere recital of reservation in the assignment, create trademark rights against others generally which it had not theretofore acquired by use, we find no obstacle to the assertion by Huber that, vis-a-vis QBA, these rights were recognized by QBA and that QBA is estopped to claim otherwise.

With regard to what the assignment purports to convey, QBA claims that it dealt only with the copyrighted label as a whole. But this contention does not view the assignment realistically.   Although the assignment does refer to the label as a whole, it also specifically transfers "each and every part thereof," and there can be no doubt that the "part thereof" QBA was interested in acquiring was the name "Sunbeam."

We hold that Huber did reserve the exclusive right to use "Sunbeam" vis-a-vis QBA in the territory specified in the assignment.   The assignment was accepted, the whole course of dealing between the parties, both before and after the execution of the two documents on December 26, 1944, is a recognition, not only of Huber's exclusive right to use "Sunbeam" in the territory specified but also the exclusive right to use therein the entire Sunbeam campaign, including the picture of the little girl and other Sunbeam advertising prepared by QBA in collaboration with Huber, and Huber acted throughout in reliance on such recognition of its rights.   This is all that is necessary to establish an estoppel *inter partes*.   See Kirk v. Hamilton, 102 U.S. 68, 26 L.Ed. 79; Dickerson v. Colgrove, 100 U.S. 578, 25 L.Ed. 618; Dair v. United States, 16 Wall. 1, 83 U.S. 1, 21 L.Ed. 491.

■  It is also clear that such an agreement between QBA and Huber to give Huber the exclusive right to use the Sunbeam mark within a specified area was valid and not contrary to the public interest.   The division of territory was not designed to, and in fact did not, work a fraud on the public, cf. Stahly, Inc. v. M. H. Jacobs Co., D.C.N.D.Ill., 87 F.Supp. 48, modified 7 Cir., 183 F.2d 914, certiorari denied 340 U.S. 896, 71 S.Ct. 239, 95 L.Ed. 650; but cf. Borden Ice Cream Co. v. Borden's Condensed Milk Co., 7 Cir., 201 F. 510, 513, but rather it had "a legitimate business purpose," Chester H. Roth, Inc. v. Esquire, Inc., 2 Cir., 186 F.2d 11, 15, since Huber previously had the right to the use of the trademark "Sunbeam" on bread and re-

---

20. There is little in the case law on the subject to indicate the extent to which, if at all, geographical subdivision of cities is feasible or desirable in connection with the protection of trademark rights, and we express no opinion whatever on that subject.

lated products and had sold its products throughout most of the area reserved to it in the assignment.

There can be no doubt that the mark "Sunbeam" became merged in the "Sunbeam campaign" after the launching of this QBA advertising program. Both Huber and QBA claim that "Sunbeam" and the campaign as a whole are inseparable, and with this contention we are in agreement. Loonen v. Deitsch, D.C.S.D.N.Y., 189 F. 487 and Layton Pure Food Co. v. Church & Dwight Co., 8 Cir., 182 F. 24, holding that a manufacturer can use, and protect as a trademark, more than one independent mark on the same product or wrapper are not in conflict with this position. In Loonen the Court held that, since the mark in question was larger and had been placed in a more prominent position on the product than two other symbols, it was certainly a valid trademark, and in the Layton Pure Food Co. case the court merely upheld the complainant's right to adopt two distinct markings as trademarks on the same package. These cases rest on the basic principle of trademark law that any symbols which, through adoption and use, have become associated with and have identified a product in the public mind can be protected as a trademark.

In the case at bar, however, the word "Sunbeam" and the girl's picture were given equal prominence in advertising, on bread wrappers and end labels, and the girl was referred to as "Miss Sunbeam." To say that "Sunbeam" is separable from the rest of the promotion campaign is to ignore the function of a trademark as a means of product identification. At the trial below, one witness testified that when she wanted a loaf of Huber's Sunbeam bread she asked her young nephew "to run down to (the grocery store) and get me a loaf of bread with the little girl's picture on it," and he got the "Sunbeam" bread she wanted. There was other testimony by consumers that they looked for the wrapper or the end label with the little girl's picture when they sought "Sunbeam" bread. This, of course, was the inevitable result of the QBA and local-member advertising program which had been in effect for more than two years before Huber executed the assignment.

Accordingly, in the view we take of the case, the acceptance of the assignment, which reserved "full and unrestricted" trademark rights to Huber in the designated area, and which involved a mark that of necessity had become merged in the overall campaign then in progress, gave rise to a valid and binding estoppel against QBA. In other words, we hold QBA, and necessarily its alleged licensee Stroehmann, estopped to question Huber's exclusive rights, within the territory specified in the assignment, to the use of the "Sunbeam campaign." And as an independent ground of decision we hold that Huber's license construed in the light of the assignment and the pertinent extrinsic evidence carried exclusive right to the Sunbeam campaign in the designated territory.

We cannot agree, on the other hand, with QBA's contention that Huber is estopped, because of its continuous membership in QBA, from claiming any exclusive rights. While we are convinced that QBA exercised sufficient control over Huber's baking operations to protect its trademark as a collective mark,[21] it does not follow that Huber's

21. 15 U.S.C.A. Section 1054 provides that " * * * collective * * * marks * * * shall be registrable * * * in the same manner and with the same effect as are trade-marks, by persons * * * exercising legitimate control over the use of the marks sought to be registered, even though not possessing an industrial or commercial establishment, and when registered they shall be entitled to the protection provided * * * in the case of trade-marks * * *" See E. I. Du Pont De Nemours & Co. v. Celanese Corp., 167 F.2d 484, 487–488, 3 A.L.R.2d 1213, 35 C.C.P.A.,Patents, 1061; Doud v. Hodge, D.C.N.D.Ill., 146 F.Supp. 887, 890; Arthur Murray, Inc. v. Horst, D.C.D.Mass., 110 F.Supp. 678, 680; also, Developments in the Law—Trade-Marks and Unfair Competition, 68 Harv.L.Rev. 814, 871–72 (1955).

membership was similar to that of any other QBA member. The differences between the Sunbeam licensing agreement with Huber and the Sunbeam contracts given to other QBA members show the contrary to be true. Among the numerous differences the most important are the failure to specify that Huber's license is non-exclusive, a term which appears in the license agreements with all the other members, and the grant of the right to assign the "Sunbeam" mark to a purchaser of Huber's business.[22] In addition, Huber was not required to buy all its "Sunbeam" advertising material exclusively from QBA, and Huber actually did buy some of those supplies from other sources.

While Huber did submit to QBA sanitation and quality control, it nonetheless derived numerous benefits for itself in doing so. Such compliance by Huber, in our opinion, has no bearing on Huber's claim to exclusive Sunbeam rights within its territory. Indeed, over a period of several years after the execution of the instruments Huber notified QBA on numerous occasions that it considered its right to the use of Sunbeam material in its territory to be exclusive, and QBA acquiesced in these demands by refusing to grant Stroehmann any Sunbeam rights in the Huber area. Thus it cannot be said that the conduct of both Huber and QBA during this period was such as would estop Huber from asserting the position it had successfully maintained until, in 1951, QBA extended Stroehmann's license. Indeed, we find no inconsistency whatever between Huber's conduct throughout and its claim of exclusive rights to the Sunbeam campaign in the territory reserved in the assignment.

The permanent injunction prayed for in the complaint should have been granted and an accounting and assessment of damages ordered.

Reversed and remanded to the District Court for proceedings not inconsistent with this opinion.

---

22. We do not decide that Huber if it ceased to be a member of QBA, or a purchaser of the Huber business who did not become a member of QBA, could lawfully use the "Sunbeam campaign." See Royal Baking Powder Co. v. Federal Trade Commission, 2 Cir., 281 F. 744; Independent Baking Powder Co. v. Boorman, C.C.D.N.J., 175 F. 448; Prince Mfg. Co. v. Prince's Metallic Paint Co., 135 N.Y. 24, 39, 31 N.E. 990, 17 L.R.A. 129.